**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**MIDDLE DIVISION**

SAMARA CONSULTANT GROUP,  )
and A.M. SAMARA,  )
  )
    Plaintiffs,  )
  )
v.  )  Civil Action No.: 02-PT-0707-M
  )
S & DAVIS INTERNATIONAL, INC.,  )
ROY DAVIS, et al.,  )
  )
    Defendants.  )

*FILED*

*03 MAR -3 PM 2: 06*

*U.S. DISTRICT COURT*
*N.D. OF ALABAMA*

*ENTERED*

*MAR - 3 2003*

## MEMORANDUM OPINION

This cause comes on to be heard upon cross-motions for summary judgement.  Plaintiffs

Samara Consultant Group and A.M. Samara (collectively "Samara") filed their motion (Doc. 51)

against Defendants S & Davis International, Inc. and Roy Davis (collectively "Davis") on

December 16, 2002.  Davis filed his motion (Doc. 72) against Samara on January 15, 2003.[1]

### FACTS AND PROCEDURAL HISTORY[2]

**I. The Parties**

A.M. Samara is a resident of Egypt, and is president and owner of Samara Consultant

Group, an Egyptian corporation. *See* Third Am. Compl. at ¶ 1.  S & Davis International is an

Alabama corporation located in Russellville, Alabama. *Id.* at 2.  Roy Davis is the controlling

stock-holder, chairman of the board, and chief executive officer of S & Davis International. *Id.*

Phillip Geddes is an attorney licensed to practice law in the State of Alabama. *Id.*

---

[1]Samara and defendant Phillip Geddes have also filed cross-motions for summary judgment.  Those motions will not be addressed in this opinion.  Defendants Mrs. Roy Davis, David W. Davis, and Voncile H. Davis were dismissed by court order on September 6, 2002.  (Doc. 41).

[2]The Statement of Facts and the summary of the parties' arguments may overlap somewhat.



## II. The Joint Venture Agreement

On April 21, 1996, Samara and Davis "irrevocably agreed and accepted to enter" into a

Joint Venture Agreement. *See* Pl. Ex. 1; Def. Ex. D [hereinafter "JVA"]. Samara and Davis

agreed to "bind themselves and their companies to do business in the REPUBLIC OF YEMEN

for their mutual benefit." *Id.* The business covered by the JVA "includ[ed] but [was not]

restricted to:"

> A. ALL KINDS OF COMMODITIES, FOOD, AND ALL KINDS OF SUPPLYS [sic].
>
> B. TURN-KEY PROJECTS, SUPPLYING, CONSTRUCTION AND/OR FINANCING.
>
> C. AGRICULTURE PROJECTS INCLUDING FARMING AND ANIMAL AND CHECKEN [sic] FOOD.
>
> D. INDUSTRIAL SUPPLYS [sic] AND CONTRACTS AS ELECTRICAL, MECHANICAL . . . etc.
>
> E. MEDICAL EQUIPMENT AND HOSPITALS INCLUDING TURN-KEY HOSPITAL PROJECTS.

*Id.* The JVA also stated that it would cover "any other activities which could be acheived [sic]

in any other field for the mutual benefit of the two parties." *Id.* Under the JVA, the "profit of

each and every project, tender and/or supply shall be divided between the two parties on 50/50

basis." *Id.*

## III. The Wheat Contract

On May 14, 1996, Samara signed a contract with the Republic of Yemen ("Yemen") for

the sale of wheat. *See* Pl. Ex. 2; Def. Ex. G. Samara signed the contract on behalf of Davis. *Id.*[3]

------

[3]As will be discussed below, there is a dispute as to when Yemen "accepted" Davis' offer.

In October 1996, Yemen defaulted on the contract. *See* Pl. Ex. 3 at ¶ 8. Davis sought arbitration of the contract with the Grain and Free Trade Association ("GAFTA"), located in London, England. *See* Pl. Ex. 66. On September 22, 1997, GAFTA ruled that Yemen was in breach of contract, but it also ruled that Davis had failed to prove damages. *Id.* Davis filed an appeal, and was ultimately awarded $17,310,000, plus pre-judgment interest. *See* Pl. Ex. 70. Davis filed suit in the United States District Court for the Northern District of Alabama, seeking to enforce the arbitration award. *See* Pl. Ex. 147. On September 11, 2001, the District Court issued an order awarding Davis $27,150,315.53. *See* Pl. Ex. 121; Def. Ex. A.[4] A settlement between Davis and Yemen was eventually reached for $16,325,000. The money was distributed as follows: $5,768,750 to one Mohamed Saeed ("Saeed"); $4,222,750 to Geddes for attorney's fees; $1,000,000 to Samara; and the rest to S & Davis International, to cover its expenses and its profits. *See* Def. Exs. B & C. Apparently, Davis' share was in turn transferred to another entity, Strickland and Davis DISC Corporation. *See* Pl. Ex. 150 at 50.

## IV. The Dispute

There is no dispute that the parties entered into the JVA. There is also no dispute that a contract was entered into with Yemen, that Yemen defaulted on that contract, that this court issued a judgment in favor of Davis, or that Davis ultimately settled its dispute with Yemen. The only dispute in this case is whether the wheat contract with Yemen was covered under the JVA, thus entitling Samara to more than the $1,000,000 he has already received.

### A. Plaintiffs' Statement of Facts

Samara asserts that the origins of the wheat contract began with a phone call from Jamil

---

[4]The amount was comprised of the $17,310,000 arbitration award, $2,325,938.93 in pre-judgment interest, and $7,514,376.60 in post-judgment interest.

3

El Daher ("El Daher") to Samara in early March 1996. *See* Pl. Ex. 3. In response, Samara called El Daher and then sent an "urgent" fax to Davis on March 9, 1996. *See* Pl. Ex. 10. Samara asked Davis if it were acceptable that the Central Bank of Yemen defer payment for one year, and to provide a quotation for the cheapest acceptable type of flour and corn. *Id.* Samara also informed Davis that he would need to appoint a local agent, and that the local agent fee was generally from 3% to 5%. *Id.* After speaking with Davis on the phone, Samara sent another fax on March 10, 1996. *See* Pl. Ex. 11. The fax suggested a margin of $20-25 per metric ton sold, and stated that "[o]ur margin will be divided 50/50 between us." *Id.* The fax also provided that an "invoice should be under S & DAVIS AND SAMARA GROUP. If S & DAVIS name is used <u>LONELY</u> [sic], this shall mean <u>S & DAVIS + SAMARA GROUP, (PARTNERS).</u>" *Id.* (emphasis in original).

On March 12, 1996, Davis appointed Samara as "Regional Manager and Representative of S & Davis International, Inc.," with authority to appoint a local agent in Yemen. *See* Pl. Ex. 12. Also on March 12, 1996, Davis presented an offer to Yemen for 100,000 metric tons of wheat. *See* Pl. Ex. 13. On March 13, 1996, Samara amended the specifications of the wheat. *See* Pl. Ex. 14. On March 18, 1996, Samara sent, on behalf of Davis, a quote to the Yemeni Ministry of Provision. *See* Pl. Ex. 15. This offer was sent via Saeed. *Id.* On March 18, 1996, Davis faxed a letter to Samara suggesting a 2% margin "for Samara-Davis." *See* Pl. Ex. 16. Davis, in his deposition, confirmed that the referenced 2% would be divided between the parties. *See* Pl. Ex. 8 at 67-68. Davis also referred to himself and Samara as being in a "partnership." *Id.* at 68. Davis also made reference to himself and Samara possibly contemplating a "joint venture." *Id.* at 71.

Also on March 18, 1996, Samara sent two invoices to Saeed. *See* Pl. Ex. 17. The letter, sent from Samara Consulting Group, made reference to "our principals, S & DAVIS INTERNATIONAL, INC." *Id.* On March 23, 1996, Samara sent another revised offer and specification. *See* Pl. Ex. 18. Also on March 23, 1996, Samara sent a fax to Davis advising him that Yemen was accepting the wheat price with certain modifications. *See* Pl. Ex. 19. On April 2, 1996, Samara and Davis wrote the General Corporation of the Republic of Yemen ("General Corporation") clarifying certain points of the offer. *See* Pl. Ex. 20. The letter was signed by Davis as Chairman of S & Davis International, and by Samara for Samara Consulting Group, acting as Regional Manager of S & Davis International. *Id.*

On April 4, 1996, Samara appointed Saeed as the local agent. *See* Pl. Ex. 22. The letter was written on S & Davis International letterhead, stating that it was sent from the Regional Office in Cairo. *Id.* The letter was signed by Samara as Regional Manager, and was accepted by Davis. *Id.* Also on April 4, 1996, Samara and Davis sent another letter to the General Corporation regarding the offer. *See* Pl. Ex. 23. The letter was signed by Davis for S & Davis International, and by Samara for "Samara Consulting Group, Regional Manager for S & Davis International, Inc." *Id.* On April 17, 1996, the General Corporation tentatively agreed to accept the offer. *See* Pl. Ex. 26. Also on April 17, 1996, Samara and Davis sent a letter to the General Corporation, notifying it that Davis and Samara would be coming to Yemen. *See* Pl. Ex. 25. Davis was listed as Chairman and C.E.O. of S & Davis International, and Samara was listed as Regional Manager. *Id.* The letter was written on S & Davis International letterhead, and sent from the Cairo office. *Id.* Samara contends that the JVA, which was entered into on April 21, 1996, was signed in anticipation of the final wheat contract with Yemen. Samara notes that the

language of the JVA is very broad, and does not exclude the wheat contract.

On April 22, 1996, the day after the JVA was signed, Davis and Samara traveled to Yemen and stayed several days to conduct negotiations with the General Counsel of the General Corporation. *See* Pl. Ex. 3 at ¶ 5. On May 3, 1996, after returning from Yemen, Davis wrote a letter to the General Corporation. *See* Pl. Ex. 31. Davis stated that "[w]e [Davis and Samara] have moved forward to protect our position regarding the wheat." *Id.* On May 6, 1996, Samara wrote Davis, stating that "I am leaving for Yemen . . . expecting to sign the contract the next day." *See* Pl. Ex. 33. On May 7, 1996, Samara returned to Yemen and conducted three weeks of negotiations to finalize the wheat contract. *See* Pl. Ex. 3 at ¶ 6. Also on May 7, 1996, Samara faxed a letter to Davis stating that he had arrived in Yemen, and that "we have meeting tomorrow . . . concerning the contract which is to be signed." *See* Pl. Ex. 34. On May 9, 1996, Samara wrote a letter to Saeed[5] concerning his amount of commission for serving as the local agent in Yemen. *See* Pl. Ex. 35.

On May 14, 1996, Samara, on behalf of S & Davis International, signed the wheat contract at issue with the General Corporation. *See* Pl. Ex. 2. The contract stated that Samara was "fully authorized with full power of attorney to sign this contract as *as per letter dated 21st April/96*." *Id.* (emphasis added). As noted above, the JVA was entered into on April 21, 1996. *See* Pl. Ex. 1.

Samara contends that after the wheat contract was signed, he continued to act as a partner

---

[5]In the letter, his name is spelled "Said."

regarding the contract with Yemen.[6]  On the bottom of a letter from Yemen to Davis, dated May 28, 1996, Samara asked Davis to "[p]lease confirm the contract signed May 14, 1996."  *See* Pl. Ex. 37.  On June 6, 1996, Davis wrote Samara regarding the letter of credit from Yemen to cover the wheat deal.  *See* Pl. Ex. 39.  In that letter, Davis stated that it "has been 23 days since signing of contract."  *Id.*  On May 12, 1996, Davis wrote the Arab American Bank in which, Samara contends, he makes reference to the JVA.  *See* Pl. Ex. 40.  Samara also includes several other letters to show how he became involved in the wheat deal, that he continued to work on the wheat contract after it was signed, and that he provided information to Davis about the status of the contract.  *See* Pl. Exs. 41-47; 49-52.  Samara also notes that he traveled to Yemen on several occasions for extended periods of time, at his own expense, to try and effectuate the wheat deal.  *See* Pl. Ex. 4.

As noted above, Yemen ultimately defaulted on the wheat contract.  It was Samara who faxed Davis information about how to contact GAFTA.  *See* Pl. Ex. 53.  After the GAFTA appeal that resulted in the award, Davis, Samara, and Geddes traveled to Yemen and met with several officials in an attempt to work out a settlement.  *See* Pl. Ex. 3 at ¶ 11.  This was the first meeting between Samara and Geddes.  During the trip, Samara gave a copy of the JVA to Geddes.  *See* Pl. Ex. 149 at 1, 51-52; Pl. Ex. 7 at 248-52.  On October 13, 1998, Davis sent Samara a fax giving him discretion to settle the dispute.  *See* Pl. Ex. 82; Pl. Ex. 12 at 113.  The dispute was nearly settled, *see* Pl. Exs. 80-83, but ultimately no agreement was reached.  At that point, the federal lawsuit to enforce the arbitration award was filed.  The parties agreed that

---

[6]Samara also includes ten proposals to other entities in the name of the JVA.  *See* Pl. Ex. 38.  In these proposals, Samara listed himself as "Partner & Regional Manager."  Samara states that he signed these proposals as a partner because the receiving entity was not aware of the JVA.  *See* Pl. Ex. 5.

Geddes would receive a 30% fee for his work. *See* Pl. Ex. 6 at 272-73.

After the lawsuit was filed, Davis, On January 26, 1999, sent Samara a fax stating that the award would be on split a 50/50 basis, after expenses, with each of them receiving $2,881,450. *See* Pl. Ex. 96. The next day, Davis wrote Samara again, stating that there would be an attorney's fee of 30%, and that any balance would be divided on a 50/50 basis. *See* Pl. Ex. 98. Samara contends that after the September 11, 2001 judgment, Davis and Geddes substantially reduced communications with him. *See* Pl. Ex. 3 at 16. Samara asserts that neither Davis or Geddes sought his approval to settle the amount owed under the judgment.

B. Defendants' Statement of Facts

Davis does not dispute that the JVA was signed on April 21, 1996. *See* Def. Ex. D. Nor does he dispute the terms of the JVA as cited by Samara. Rather, Davis asserts that the JVA did not apply to the wheat contract at issue. Davis contends that Samara was acting as a Regional Manager of Davis in connection with this transaction. *See* Def. Ex. B at ¶ 6; Pl. Ex. 12; Def. Ex. E. Moreover, Davis asserts that the wheat contract at issue was accepted on April 17, 1996, not May 14, 1996. *See* Def. Ex. G. Thus, the offer was accepted before the JVA was executed. Davis notes that the written contract, which was executed on May 14, 1996 (after the Yemeni government had already accepted the offer), makes no reference to the JVA, and that Samara signed on behalf of S & Davis International, not as a part of a joint venture. *See* Def. Ex. G.

Davis also asserts that the JVA, which does not apply to the wheat contract at issue, was nevertheless superceded by the January 26, 1999 letter cited by Samara. *See* Pl. Ex. 96; Def. Ex. I. The letter stated that Samara would be paid on a 50/50 basis "**if** we collect $19 million. That is why I [Davis] prefer to sell, if possible, at a discount." *Id.* (emphasis added). Since Davis did

8

not recover $19 million or sell at a discount, he asserts that there can be no 50/50 split. Davis asserts that the January 27, 1999 letter, cited by Samara, was based on the previous letter. *See* Pl. Ex. 98; Def. Ex. I. Davis also contends that these two letters were themselves superceded by letters dated May 8, 2001 and August 27, 2001. *See* Def. Exs. L, M. These letters, written to Saeed, stated that Samara would receive a maximum of 15% of the settlement proceeds, which could be reduced to 10% if certain factors were met. *See also* Def. Ex. K at ¶ 3 (noting that Saeed faxed the May 8, 2001 letter to Samara); Def. Ex. N. Samara never objected to the May 8, 2001 letter. *See* Def. Ex. K at ¶ 3. The August 27, 2001 letter stated that the agreement "supercedes any and all previous commission agreements." *See* Def. Ex. M; *see also* Def. Ex. K at ¶ 4; Def. Exs. N, O (noting that Samara received and did not object to the August 27, 2001 letter).[7]

Davis also asserts that some of the documents submitted by Samara in support of its position are forged. The first document is the actual sales contract, executed on May 14, 1996. Davis claims to have a draft copy of the sales contract, sent to him via fax on April 28, 1996, which states that Samara "is fully authorized with full power of attorney to sign this contract as per letter dated April 17, 1996." *See* Def. Ex. P. Davis contends that this reference to April 17, 1996 is to the letter of acceptance sent from the General Corporation in which the General Counsel stated that "you are kindly requested to . . . delegate a representative . . . with full power of attorney." *See* Def. Exs. P, G. By contrast, the sales contract submitted by Samara states that he "is fully authorized with full power of attorney to sign this contract as per letter dated April 21, 1996." *See* Pl. Ex. 2; Def. Ex. H. Davis asserts that this forgery was an attempt to include

---

[7]Samara has filed a motion to strike (Doc. 84) a portion the affidavit of Sherry Myrick, Def. Ex. K. Samara contends that Myrick had no basis for some of the assertions in her affidavit, specifically ¶¶ 1-2.

the JVA in the wheat contract. Davis notes, in support of this position, that the JVA is not a letter, and that there is no letter dated April 21, 1996. Davis also contends that if there was to be a reference to the JVA, it would have more clearly been indicated. Finally, Davis notes that even in Samara's version of the wheat contract, Samara signed "on behalf of" S & Davis International, not as a joint venture.

Davis also asserts that the March 10, 1996 letter submitted by Samara is a forgery. Davis claims to have an original, noting the time and date stamp from the fax machine at the top of the letter. *See* Def. Ex. Q. Davis asserts that Samara has added the following language in order to bring the wheat contract under the JVA: "If S & DAVIS name is used <u>LONELY</u>, this shall mean <u>S & DAVIS + SAMARA GROUP, (PARTNERS);</u>" and "A Joint-Venture Agreement with above understanding shall be made for all business in Yemen." *See* Pl. Ex. 11 at ¶¶ 1-2; Def. Ex. R at ¶¶ 1-2. Indeed, Davis notes that the letter appointing Samara as Regional Manager was sent on March 12, 1996, two days after the disputed letter. If Samara's version of the March 10, 1996 letter was accurate, Davis asserts, he would have objected to being called a Regional Manager instead of a partner.

Next, Davis submits a large amount of correspondence related to the wheat contract, some of which was also submitted by Samara, in which Samara identified himself as the Regional Manager of S & Davis International. *See* Def. Exs. S-AA, EE, LL. Davis also submits letters concerning business other than the wheat contract, in which Samara refers to himself as "Partner-Regional Manager." *See* Def. Exs. BB-DD, FF-KK.

Finally, Davis offers an explanation as to why he settled his claim with the Yemeni government for slightly more than half the amount he was awarded in the court judgment. Davis

contends that he received tremendous pressure from the United States Government to settle the case, so that the United States would receive the cooperation of the Yemeni government in locating the terrorists responsible for bombing the *U.S.S. Cole*. *See* Pl. Ex. B.

Samara filed his initial complaint on March 19, 2002. Samara's complaint seeks an accounting and payment to a receiver of amounts owed to it (Count I) and/or declaratory judgment/imposition of a constructive trust (Count V). He further alleges breach of contract (Count II), breach of fiduciary duty (Count III), misrepresentation (Count IV), and fraudulent transfer of funds (Count VII).[8] *See* Third Am. Compl. Samara now seeks summary judgment on Counts I and II. Davis seeks summary judgment on all counts.

## SUMMARY JUDGMENT STANDARD

Summary judgment may be granted based upon facts developed through pleadings, discovery, and supplemental affidavits, etc., if together, they show that there is no genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the initial burden of explaining the basis of his motion. *Celotex*, 477 U.S. at 323. "It is never enough [for the movant] simply to state that the non-moving party could not meet their burden at trial." *Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000) (quotation omitted). The non-moving party then bears the burden of pointing to specific facts demonstrating that there is a genuine issue of fact for trial. *Celotex*, 477 U.S. at 324. The non-moving party "must either point to evidence in the record or present additional evidence

---

[8]Samara also asks for a refund of attorney's fees (Count VI), but that count is alleged against Geddes only.

'sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.'" *Hammer v. Slater*, 20 F.3d 1137, 1141 (11th Cir. 1994) (quotation omitted). Summary judgment is required where the non-moving party merely repeats its conclusory allegations, unsupported by evidence showing an issue for trial. *Comer v. City of Palm Bay*, 265 F.3d 1186, 1192 (11th Cir. 2001) (citation omitted).

Summary judgment will not be granted until a reasonable time has been allowed for discovery. *Comer*, 265 F.3d at 1192. Moreover, "[w]hen deciding whether summary judgment is appropriate, all evidence and reasonable factual inferences drawn therefrom are reviewed in a light most favorable to the non-moving party." *Korman v. HBC Florida, Inc.*, 182 F.3d 1291, 1293 (11th Cir. 1999). Finally, the trial court must resolve all reasonable doubts in favor of the non-moving party, although it need not resolve all doubts in a similar fashion. *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990).

## ARGUMENTS

### I. Plaintiffs' Position

Samara argues that the JVA included the wheat contract. Samara notes that the JVA states that it is "irrevocable." Moreover, the JVA was to cover "all kinds of commodities" "in the County of Yemen." *See* Pl. Ex. 1. Samara argues that this language is broad and inclusive, and does not contain any kind of exceptions or exclusions. Samara notes that he helped originate the wheat deal. Prior to signing the JVA, Samara argues, the parties signed several communications to Yemen showing them as joint parties. *See, e.g.,* Pl. Exs. 18, 20, 23. Samara also notes the amount of communications between himself, Davis, and others. *See, e.g.,* Pl. Exs. 10-11, 14-15, 17-22; 28-20; 33-35. Samara also points out that Davis often referred to "we" or

"our" when communicating with him. *See, e.g.,* Pl. Exs. 28, 31, 62, 69, 73, 75. Samara contends that after signing the JVA, he signed on behalf of S & Davis International, because he was representing the JVA parties. *See* Pl. Ex. 5. He also notes that the ultimate sales contract specifically made reference to the JVA. *See* Pl. Ex. 2.

Samara also notes a fax to Davis which included the words "since we are partners." *See* Pl. Ex. 75. He also notes that Davis often asked for his advice, *see* Pl. Exs. 79, 94, and that a certain SNG Enterprises wrote a letter referencing the JVA. *See* Pl. Ex. 56.[9] Finally, Samara notes that Davis acknowledged several letters and faxes during January 1999 reaffirming their agreement to divide any settlement on a 50/50 basis. *See* Pl. Exs. 94-98.

Next, Samara argues, the evidence shows that he acted as a partner with reference to the wheat contract. He notes that he traveled to Yemen on three separate occasions during 1996 to effectuate the sales contract. *See* Pl. Ex. 4. He also notes the large amount of communications that he sent regarding the wheat contract or that referenced his work on the wheat contract. *See, e.g.,* Pl. Exs. 37, 39-50, 59-60. Samara also notes that he was the one that informed Davis about GAFTA. *See* Pl. Ex. 53. Finally, he notes that his work continued through arbitration and settlement negotiations. *See, e.g.,* Pl. Exs. 64-69, 72-75, 79-89, 92-119.

Third, Samara argues, from the time that the JVA was signed until the distribution of the settlement, Davis led him to believe that any proceeds or settlement would be divided on a 50/50 basis. *See* Pl. Exs. 94, 97-98. Samara also notes that Davis told one Manu Patel that S & Davis International would receive 50% of the proceeds. *See* Pl. Ex. 114.

Fourth, Samara contends, Davis' alleged "revocation" of the JVA is a fraud.

---

[9]It is unclear to the court whether this letter references the same JVA that Samara is seeking to enforce, or whether it is a separate joint venture agreement.

13

Specifically, Samara argues, Davis is contending that the JVA was terminated by a letter dated April 10, 1997. *See* Pl. Exs. 7, 144, 148. However, Samara argues, the alleged letter was backdated and never sent to him. *See* Pl. Ex. 148. Samara notes that Davis' secretary has stated that she was told to backdate the letter. *Id.* Moreover, the letter states that the area code for Davis' phone number is "256," while in April of 1997 it was in fact "205." *See also* Pl. Ex. 152 at 70-72. Samara contends that Davis later changed his position, saying that the discrepancy was a mistake. *See* Pl. Ex. 8 at 158.

Finally, Samara disputes whether the other letters that Davis relies on could modify or supercede the JVA. Specifically, Samara agues, the letter of January 27, 1999, rather than changing their arrangement, actually confirms that the proceeds would be split on a 50/50 basis. *See* Pl. Ex. 102 at 2-3. As to the May 8, 2001 and August 27, 2001 letters, Samara contends, they were not sent to him and therefore cannot be used by Davis to unilaterally modify the JVA.[10]

## II. Defendants' Response

### A. Breach of Contract - Count II

Davis notes that for a contract to be present, there must be "an offer and an acceptance, consideration and mutual assent to the essential terms of the agreement. <u>Consideration must be present when the contract is made</u>." *Fant v. Champion Aviation, Inc.*, 689 So. 2d 32, 37 (Ala. 1997) (emphasis added). Moreover, "past consideration is not sufficient to support a contract." *Phillips Brokerage v. Professional Personnel Consultants*, 517 So. 2d 1, 2 (Ala. Civ. App. 1987). Here, Davis argues, the JVA was not supported by any additional consideration because

---

[10]Samara also asserts that his share of the settlement was instead paid to Saeed as a bribe. *See* Pl. Br. at 31-33; Pl. Ex. 128.

the Yemeni government had already accepted the wheat deal before the JVA was entered into.

Samara's assertion to the contrary, Davis asserts, is nothing more than inadmissible parol

evidence being used to contradict the clear wording of the Yemeni government's acceptance, the

sales contract, and Samara's appointment as Regional Manager. "An unambiguous contract

must be enforced as written." *Ross Neely Sys., Inc. v. Occidental Fire & Cas. Co. of North

Carolina*, 196 F.3d 1347, 1350 (11th Cir. 1999). The JVA, Davis contends, was for all future

projects, not the wheat contract.

Next, Davis argues, Samara has failed to demonstrate the existence of a joint venture.

Davis notes that the "burden of establishing the existence of a joint venture is upon the party

asserting that the relation exists." *Moore v. Merchants & Planters Bank*, 434 So. 2d 751, 753

(Ala. 1983). Davis also notes the elements of a joint venture, which include

> [A] contribution by the parties of money, property, effort, knowledge, skill, or
> other assets to a common undertaking; a joint property interest in the subject
> matter of the venture and a right to mutual control or management of the
> enterprise; expectation of profits; a right to participate in the profits; and usually,
> a limitation of the objective to a single undertaking or ad hoc enterprise. While
> every element is not necessarily present in every case, it is generally agreed that
> in order to constitute a joint venture, there must be a community of interest and a
> right to joint control. . . . Thus, in order to avoid a directed verdict on this issue,
> [a plaintiff] must show evidence supporting the existence of these two elements.

*Id.* at 753 (emphasis added) (citation omitted). Davis argues that Samara has failed to show a

community of interests or a right to joint control. For example, in the April 4, 1996 letter to

Saeed, Samara states that "by the power of authorisation [sic] given to me by our principals S &

Davis International we hereby appoint you as local agent for our incorporation." *See* Pl. Ex. 22.

Davis notes that Samara signed the letter as Regional Manager, and that Davis signed as

Chairman. Davis also notes the numerous other letters in which Samara held himself out to be a

Regional Manager.  Obviously, Davis asserts, there is no joint control in this situation, and therefore a joint venture does not exist.

Third, Davis contends, this court cannot assume that the JVA was intended to apply retroactively to the wheat contract, which was formed with the Yemeni government's acceptance of April 17, 1996.  Davis notes that Alabama courts will not allow one to assume the retroactive application for subsequent agreements unless it is absolutely clear on the face of the instrument. *See, e.g., United Wisconsin Life Ins. Co. v. Beaty*, 775 So. 2d 191 (Ala. 2000).  Here, the JVA does not contain any retroactive language, although such language would have been easy to include.  Furthermore, the sales contract makes no reference to the JVA, despite Samara's fraudulent assertion to the contrary.  Instead, Davis contends, the sales contract references the April 17, 1996 acceptance by the Yemeni government, which predated the JVA.

Fourth, Davis argues, the JVA violates the Alabama Statute of Frauds.[11]  First, Davis contends, the JVA violates the Statute of Frauds because it does not provide clearly established facts and circumstances to provide the key to identification of the subject property.  Davis cites Ala. Code § 8-9-2 (1975), which provides, in part, that

> In the following cases, every agreement is void unless such agreement or some note or memorandum thereof expressing the consideration is in writing and subscribed by the party to be charged therewith or some other person by him thereunto lawfully authorized in writing:
>
> (1) Every agreement which, by its terms, is not to be performed within one year from the making thereof.

Davis argues that, since it ultimately took over five years to collect the money from the Yemeni

---

[11]Samara has filed a motion to strike (Doc. 83) the statute of frauds argument.  Samara contends that Davis did not list the statute of frauds as an affirmative defense in his answer.  Davis filed a response (Doc. 90), contending that his third amended answer does plead the statute of frauds as an affirmative defense.

government, the JVA would be a contract that was not performed within one year of the making thereof; thus, § 8-9-2 would apply. Davis also cites *Mullinax v. Galen-Marshall, Inc.*, 642 So. 2d 431, 433 (Ala. 1994), in which the court held that "the instrument must at least furnish the means of identification, or, as some cases have it . . . provide the 'key' to identification, the applicable principle being that *that is certain which can be made certain*." (emphasis in original) (citation omitted). Here, Davis contends, the JVA does not meet this test.

Davis also argues that the JVA violates the Statute of Frauds because it does not contain any reference to the consideration supporting its existence. Davis notes that in *Holman v. Childersburg Bancorporation, Inc.*, No. 1011756, 2002 WL 31731031 (Ala. Dec. 6, 2002), the court held that, with reference to the Statute of Frauds and a contract for the sale of lands, "the writing must also contain a recital of the consideration supporting the contract." *Id.* at *3. *See also Baldwin County v. Purcell Corp.*, 972 F.2d 1558, 1566 (11th Cir. 1992) ("To comply with the Alabama Statute of Frauds as well as general contract law, the consideration for the conveyance of land must be stated within the written agreement."). Davis argues that the same rationale applies to all of § 8-9-2. Since the JVA makes no reference to any consideration, Davis contends, it is unenforceable.

Finally, Davis argues, the JVA is invalid because Samara Consultant Group is not a recognized business entity under Egyptian law, and therefore is precluded from entering into a joint venture.[12] Davis argues that it is undisputed that the JVA was entered into in Egypt.

---

[12]Samara has filed a motion to strike (Doc. 83) any argument concerning Samara Consulting Group's status under Egyptian law. Samara contends that Davis did not list Samara Consulting Group's status as an affirmative defense in his answer. Davis filed a response (Doc. 90), contending that such a defense does not need to be pled affirmatively. Davis also asserts that there has been no prejudice because he is now asserting the defense, prior to the pretrial conference in this case. *See, e.g., Pulliam v. Tallapoosa County Jail*, 185 F.3d 1182, 1185 (11th Cir. 1999). *See also* Def. Reply Br. at 6 n.1.

Therefore, Egyptian law would apply with respect to whether Samara had the capacity to enter into the JVA. *See, e.g., American Nonwovens, Inc. v. Nonwovens Engineering, S.R.L.*, 648 So. 2d 565, 567 (Ala. 1994) ("ANW is correct that the choice of law rule followed by Alabama provides that the law of the state wherein the contract was executed governs questions regarding the validity and interpretation of the contract."). Davis argues that in order engage in a commercial business and execute binding commercial contracts, all commercial companies must first register with the Egyptian Commercial Register. *See* Def. Ex. MM.[13]  However, Davis argues, Samara Consulting Group was not legally registered as of October 14, 2002. *See* Def. Exs. MM, NN. Because Samara is not registered, Davis argues, the JVA is void on its face. *Id.*[14]

### B. Breach of Fiduciary Duty - Count III

Davis argues that instead of being covered by the JVA, the wheat contract instead was facilitated through an employer-employee relationship between Davis and Samara. Davis was the employer, and Samara, as Regional Manager, was the employee. Davis cites *Miller v. SCI Sys., Inc.*, 479 So. 2d 718, 720 (Ala. 1985), in which the court stated that "a principal or employer is not the fiduciary of the agent or employee." Thus, Davis argues, since Samara was simply his employee with respect to the wheat contract, no fiduciary duty existed that could have been breached.

### C. Misrepresentation - Count IV

---

[13]Samara has filed a motion to strike (Doc. 82) the affidavit of Makram Habeel, Def. Ex. MM. He contends that Habeel has never been listed as a witness in this case. Samara also moves to strike Def. Ex. NN, relied upon by Habeel. Davis contends that because Habeel is not an expert witness, the pretrial deadlines do not apply. *See* Def. Reply Br. at 8.

[14]For a more detailed description of the Egyptian law relied upon by Davis, *see* Def. Exs. MM, NN. The court notes that Davis has otherwise argued for the application of Alabama law. If foreign law is applicable and relied upon, its proof may require expert opinion. The parties appear to expediently flip back and forth between Alabama law and Egyptian law.

18

Davis asserts that since the alleged misrepresentation concerned what he would do in the future (i.e., would split the profits 50/50), this claim is actually a claim for promissory fraud. In order to maintain a claim for promissory fraud, Davis notes, a plaintiff must show

> (1) a misrepresentation, (2) of a material existing fact, (3) upon which the plaintiff justifiably relied, (4) which proximately caused injury or damage to the plaintiff. . . . In addition, <u>the plaintiff must show that, at the time of the alleged misrepresentation, the defendant intended not to do the acts promised and intended, instead, to deceive the plaintiff.</u>

*Johnston v. Green Mountain, Inc.*, 623 So. 2d 1116, 1121 (Ala. 1993) (emphasis added) (citations omitted). The burden of proof is on the plaintiff, and "[u]nless a plaintiff puts forth some proof that there was something more than a failure to perform, something upon which a jury could infer that at the time the promise was made the defendant had no intention of performing, it is error to submit a fraud claim to the jury." *Martin v. American Med. Int'l, Inc.*, 516 So. 2d 640, 642 (Ala. 1987) (citations omitted). Moreover, "[t]he failure to perform, alone, is not evidence of intent not to perform at the time the promise was made. If it were, a mere breach of contract would be tantamount to fraud." *Purcell Co. v. Spriggs Enters., Inc.*, 431 So. 2d 515, 519 (Ala. 1983) (citations omitted). Davis argues that Samara has presented no evidence that Davis intended not to perform at the time the alleged promises were made.[15] To the contrary, Davis argues, he vigorously attempted to pursue his claims against the Yemeni government, and he in fact did pay Samara $1,000,000. Davis also asserts that promissory estoppel is extremely difficult to prove under Alabama law.

Further, Davis argues, the promissory fraud claim must fail because Samara did not rely on the alleged misrepresentations. "Reliance is an essential element of the prima facie case;

---

[15]This court agrees. *See Wright v. AmSouth Bancorporation*, ___ F.3d ___, No. 02-10006, 2003 WL 245588 (11th Cir. Feb. 5, 2003).

where there is no reliance, there can be no fraud." *Twin City Fire Ins. Co. v. Colonial Life & Acc. Ins. Co.*, 124 F. Supp. 2d 1243, 1249 (M.D. Ala. 2000) (citation and quotation marks omitted). A plaintiff must also prove that he acted upon that reliance. *See Liberty Nat. Life Ins. Co. v. Allen*, 699 So. 2d 138, 142 (Ala. 1997). *See also Smith v. J.H. Berry Realty Co., Inc.*, 528 So. 2d 314, 316 (Ala. 1988) ("To claim reliance upon a misrepresentation, the allegedly deceived party must have believed it to be true."). Davis argues that, even assuming he made the alleged misrepresentations, the amount of letters written by Samara in which he referred to himself as the Regional Manager demonstrate that he did not rely upon the assertions that he was a partner or that the profits would be split 50/50. Samara knew how to hold himself out as a partner, Davis notes, because he did so for all of the other potential business deals. His failure to do so with reference to the wheat contract shows that he knew that he was not a partner on that deal.

D. Accounting and Receiving, Imposition of a Constructive Trust, and Fraudulent Tansfer of Funds (Counts I, V, VII).

Davis argues that these claims have already been denied by this court in its April 30, 2002 findings of fact and conclusions of law with respect to the preliminary injunction hearing. Thus, Davis argues, these claims are due to be dismissed.[16]

### III. Plaintiffs' Reply

A. Breach of Contract - Count II

Samara argues that the wheat contract was not entered into until May 14, 1996, after the JVA was signed. Samara acknowledges that the Yemeni government sent an "acceptance" on April 17, 1996, but argues that this acceptance was tentative. To support this position, he notes

---

[16]Davis apparently does not understand the significance of the denial of a preliminary injunction.

that substantial negotiations occurred between the April 17, 1996 letter and the May 14, 1996 sales contract. *See* Pl. Exs. 3, 31, 33-35. Next, Samara again argues that the sales contract makes reference to the JVA. *See* Pl. Ex. 2. Third, Samara points to the deposition testimony of Davis, which Samara asserts shows that Davis thought that the April 17, 1996 acceptance was tentative. *See* Pl. Ex. 8 at 78. Finally, Samara again notes the substantial amount of work that he performed in connection with the wheat contract after the JVA was signed.

As for the lack of consideration, Samara argues that his promise to do business with Davis and the fulfillment of that promise was sufficient consideration. Samara cites Alabama Pattern Jury Instruction 10.03, which defines consideration as "anything of value promised or received, or the doing or promising to do something which one has a legal right to do, or a promise not to do something which one has a legal right to do."

Next, Samara again argues that the January 27, 1996, May 8, 2001, and August 27, 2001 letters did not modify or terminate the JVA. Specifically, he argues that Davis does not have the right to unilaterally alter the terms of the JVA.

Samara also contends that the statute of frauds would not apply, because the agreement to do business was for profit and has already been completed by the parties. He also contends that the Alabama Statute of Frauds would have no application to an agreement executed in Egypt.[17]

Finally, Samara argues that even if Samara Consulting Group was not licensed to do business under Egyptian law, he would still have a claim as an individual against Davis, because the JVA stated that the parties were binding "themselves and their companies." Thus, Samara contends, the status of Samara Consulting Group under Egyptian law is not an issue.

_____

[17]The parties may have to be consistent on what law applies. Again, the parties appear to call on whatever law seems to be convenient.

21

B. Breach of Fiduciary Duty - Count III

Samara contends that the JVA created a partnership between the parties. Samara cites

*Wood v. Phillips*, No. 1002091, 2002 WL 31492285 (Ala. Nov. 8, 2002), in which the court

stated that

> There is no arbitrary test as to whether a partnership exists, but such a
> determination will be made upon all of the attendant circumstances. . . . A
> partnership arises only from an express or implied agreement among the parties
> and is never established by implication or by operation of law. . . . This Court, in
> *Waters v. Union Bank of Repton*, *supra*, held that "[t]he surrounding
> circumstances as well as any express agreement between the parties may evidence
> the intention of the parties necessary to establish such a [partnership]
> relationship." . . . The right to manage and control a business is one circumstance
> to be considered in determining the existence of a partnership relationship.

*Id.* at *9 (citations omitted). Samara acknowledges that Alabama law does not control because

the JVA was executed in Egypt. However, as a guide, he cites Alabama's version of the

Uniform Partnership Act, because it codified the common law on partnerships. Specifically, he

cites Ala. Code § 10-8A-404, which establishes the fiduciary duties owed to each partner and the

right to an accounting.[18] Samara also cites *Ex parte Master Boat Builders*, 779 So. 2d 192 (Ala.

2000), for the proposition that the Alabama Uniform Partnership Act gave the courts more

authority to resolve disputes between partners. Specifically, the court stated that

> Before the passage of either Act, this Court had always adhered to the common-
> law principle that a partner may not recover in an action at law against fellow
> partners for matters arising out of partnership affairs until there had been a
> settlement of partnership accounts. . . . This principle was grounded in notions of
> equity that had long been a part of our law. The enactment of the APA in 1971
> was considered by this Court to be a codification of that principle . . . a position
> that was consistent with the position of most jurisdictions that had adopted the
> same basic set of partnership statutes generally known as the Uniform Partnership

---

[18]Samara cites Ala. Code § 10-8-48, which has been repealed. The court assumes that Samara intended to cite § 10-8A-404, which appears to have replaced the repealed provision. It is not clear why Alabama law would be a "guide" to Egyptian law.

22

Act, or "UPA." . . . Indeed, the APA (or UPA) provided for an accounting as the only apparent remedy to partners for claims arising out of partnership business. . .
.

In 1996, however, the Legislature enacted the AUPA, marking a significant departure from the previous view of intrapartnership actions. This Act provided partners with the option of forgoing an equitable accounting before pursuing actions at law against copartners. . . . This change reflected a rejection of the traditional view that actions between partners involving partnership affairs were exclusively equitable actions, a view that was the foundation of any remedy under the repealed APA.

*Id.* at 195 (citations omitted). Samara also cites Alabama Pattern Jury Instructions 80.03-80.05,

80.08, 80.10, 80.14, and 80.19-80.20 as a "guide" for when a partnership is created and/or

terminated. *See* Pl. Reply Br. at 9-12. In essence, Samara argues that there is an issue of fact as

to whether there was a partnership and whether it has been dissolved, and thus whether Davis

breached the fiduciary duties that he would owe to Samara as a partner.

C. Misrepresentation - Count IV

After again citing some of the alleged misrepresentations, Samara cites evidence to

demonstrate that Davis and Geddes had no intention of following through on the statements. *See*

Pl. Exs. 7, 117-18, 129, 137, 142.

D. Accounting and Receiving, Imposition of a Constructive Trust, and Fraudulent Tansfer of Funds (Counts I, V, VII).

As to the declaratory judgment/constructive trust claim, Samara argues that its outcome

depends on the breach of contract and accounting claims (Claims I-II); thus, summary judgment

is inappropriate at this stage. He makes a similar argument with respect to the fraudulent

transfer of funds claim (Count VII).

IV. **Defendants' Reply**

A. Breach of Contract - Count II

23

Davis again argues that the May 14, 1996 sales contract is nothing more than the formalization of the April 17, 1996 acceptance by the Yemeni government. Davis notes that as soon as an offer and acceptance is made, a contract is formed. *See Moseley v. First Cmty. Bank,* 649 So. 2d 1274, 1276 (Ala. 1994) ("When a contract is made or [an] unqualified proposal [is] accepted by the letter of the promisor, it is complete and takes effect the moment the same is deposited and duly posted in the post office."). Davis also notes that "[i]f the contract is actually entered into and made . . . the agreement becomes at once effective, although it was expected that the terms should afterwards be embodied in an written instrument and signed." *Southern Ry. Co. v. Huntsville Lumber Co.,* 67 So. 695, 696 (Ala. 1914). *See also Lifecare Int'l, Inc. v. CD Med., Inc.,* 68 F.3d 429, 436 (11th Cir. 1995) ("Simply because the parties contemplated the drafting of a subsequent formal, written contract, does not denote that they did not intend to be bound immediately by their oral or written negotiations.") (interpreting Florida law). Davis also again notes the discrepancy between what he submitted as the sales contract, and what Samara fraudulently submitted as the sales contract. *See* Def. Exs. H, P.

### B. Breach of Fiduciary Duty - Count III

Davis does not dispute the law of partnership as cited by Samara. Rather, he argues, there in no evidence that a partnership existed. Rather, the evidence shows that Samara was acting as a Regional Manager, an employee of S & Davis, International. *See Miller,* 479 So. 2d at 719-20.

### C. Misrepresentation - Count IV

Again, Davis notes that Samara consistently held himself out to be a Regional Manager in connection with the wheat contract. *See* Def. Exs. S-LL. Thus, even if there was a

24

misrepresentation, Davis argues, Samara did not rely on it.  Davis also again argues that just because a promise is not kept does not mean that there was no intention to keep it.  Davis contends that Samara has failed to show a lack of intent to keep the alleged promises.  Davis also argues that since the JVA is void because of the Statute of Frauds, there can be no claim for promissory estoppel.  *See Bruce v. Cole*, No. 1000080, 2003 WL 164596 (Ala. Jan. 24, 2003) (holding that "an oral promise that is void by operation of the statute of frauds will not support an action against the promisor for promissory estoppel").

Davis also notes that, after the JVA was signed, Samara continued to send correspondence to Davis on Samara Consulting Group letterhead.  *See* Def. Exs. NN-QQ.  Thus, Davis argues, Samara obviously did not believe that there was a joint venture with Davis.

### CONCLUSIONS OF THE COURT

After considering all of the foregoing arguments and that portion of the underlying evidence which appears to be undisputed, the court concludes as follows:

(1) The motion of Davis with reference to accounting and breach of contract claims (as related to the alleged joint venture, partnership, or otherwise) is due to be denied.  The motion of Davis as to all other claims will be granted.[19]  A number of the additional claims were apparently designed to attempt to cause the court to freeze assets.  There is no substantial evidence to support a promissory fraud claim.

(2) The motion of Samara will be denied.

In essence, this is a breach of contract, partnership, or joint venture case which involves substantial factual issues sometimes resulting from sloppy handling.  With regard to the conflict

---

[19]For further discussion as to why some of these claims should be dismissed, see proceedings with regard to the preliminary injunction.

of law issues, the parties are to contemporaneously file at 11:00 AM on March 11, 2003 a clear

statement of what law they argue should be consistently applied to the case at trial.

This _____ day of March, 2003.

ROBERT B. PROPST
**SENIOR UNITED STATES DISTRICT JUDGE**