IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

| | |
|---|---|
| SAMARA CONSULTANT GROUP, and A.M. SAMARA, <br><br>Plaintiffs, <br><br>v. <br><br>PHILLIP A. GEDDES, et al., <br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) |

Civil Action No.: 02-PT-0707-M

**MEMORANDUM OPINION**

This cause comes on to be heard upon cross-motions for summary judgment. Plaintiffs Samara Consultant Group and A.M. Samara (collectively "Samara") filed their motion (Doc. 70) against defendant Phillip A. Geddes ("Geddes") on January 15, 2003. Geddes filed his motion (Doc. 59) against Samara on January 7, 2003.[1]

**FACTS AND PROCEDURAL HISTORY[2]**

The court will not restate the numerous and detailed set of facts that were developed during the cross-motions for summary judgment between Samara and S & Davis International. *See* Mem. Op. of March 3, 2003 (Doc. 93). However, some specific facts are pertinent to the current motions.

---

[1] These motions for summary judgment came under submission on March 7, 2003. While the court severed the motions for trial, the issues with regard to the motions for summary judgment had been fully developed prior to trial. The claims against Geddes were severed and not addressed at trial. Samara and defendants S & Davis International, Inc. and Roy Davis also filed cross-motions for summary judgment. Those motions were resolved by court order on March 3, 2003 (Doc. 94). Defendants Mrs. Roy Davis, David W. Davis, and Voncile H. Davis were dismissed by court order on September 6, 2002. (Doc. 41). The jury returned a verdict in favor of the plaintiffs against the corporate defendant(s).

[2] The Statement of Facts and the summary of the parties' arguments may overlap somewhat.

A.M. Samara is a resident of Egypt, and is president and owner of Samara Consultant Group, an Egyptian corporation. *See* Third Am. Compl. at ¶ 1. S & Davis International is an Alabama corporation located in Russellville, Alabama. *Id.* at 2. Roy Davis is the controlling stockholder, chairman of the board, and chief executive officer of S & Davis International (collectively "Davis"). *Id.* Geddes is an attorney licensed to practice law in the State of Alabama. *Id.*

## II. The Joint Venture Agreement and the Wheat Contract

On April 21, 1996, Samara and Davis entered into a Joint Venture Agreement. *See* Pl. Ex. 1. Samara and Davis agreed to "bind themselves and their companies to do business in the REPUBLIC OF YEMEN for their mutual benefit." *Id.* The JVA also stated that Davis and Samara would split any profits on a 50/50 basis. *Id.* On May 14, 1996, after several months of negotiations, Samara signed a contract with the Republic of Yemen ("Yemen") for the sale of wheat. *See* Pl. Ex. 2. Samara signed the contract on behalf of Davis. *Id.* In October 1996, Yemen defaulted on the contract. *See* Pl. Ex. 3 at ¶ 8. Davis sought arbitration of the contract with the Grain and Free Trade Association ("GAFTA"), located in London, England. *See* Pl. Ex. 66. On September 22, 1997, GAFTA ruled that Yemen was in breach of contract, but it also ruled that Davis had failed to prove damages. *Id.* Davis filed an appeal, and was ultimately awarded $17,310,000, plus pre-judgment interest. *See* Pl. Ex. 70.

Davis then filed suit in the United States District Court for the Northern District of Alabama, seeking to enforce the arbitration award. *See* Pl. Ex. 147. On September 11, 2001, the

2

District Court issued an order awarding Davis $27,150,315.53. *See* Pl. Ex. 121.[3] A settlement between Davis and Yemen was eventually reached for $16,325,000. The money was distributed as follows: $5,768,750 to one Mohamed Saeed ("Saeed")[4]; $4,222,750 to Geddes for attorney's fees; $1,000,000 to Samara; and the rest to S & Davis International, to cover its expenses and its profits. Apparently, Davis' share was in turn transferred to another entity, Strickland and Davis DISC Corporation. *See* Pl. Ex. 150 at 50.

## III. The Dispute

There is no dispute that Davis and Samara entered into the JVA. There is also no dispute that a wheat contract was entered into with Yemen, that Yemen defaulted on that contract, that this court issued a judgment in favor of Davis, or that Davis ultimately settled its dispute with Yemen.

### A. Plaintiffs' Statement of Facts

As noted above, Yemen ultimately defaulted on the wheat contract. Samara contends that after the initial GAFTA ruling, Davis hired Manu Patel and Jim Miller to conduct the GAFTA appeal. *See* Pl. Ex. 155 at 2. Samara contends that at this point, Geddes had not been retained by Davis as an attorney. *Id.* Rather, he was hired simply to prepare documents for the appeal. *See* Pl. Ex. 154 at 20, 26-28. After the GAFTA appeal that resulted in the award, Davis, Samara, and Geddes traveled to Yemen and met with several officials in an attempt to work out a settlement. *See* Pl. Ex. 3 at ¶ 11; Pl. Br. at 14-16. This was the first meeting between Samara and Geddes.

---

[3] The amount was comprised of the $17,310,000 arbitration award, $2,325,938.93 in pre-judgment interest, and $7,514,376.60 in post-judgment interest.

[4] Samara contends that a portion of the amount paid to Saeed was a bribe, and that Geddes knew that it was a bribe.

Geddes testified that he thought that Samara was simply an interpreter, although he admitted that no interpreter was needed. *See* Pl. Ex. 154 at 43, 48, 50. During the trip, Samara gave a copy of the JVA to Geddes. *See* Pl. Ex. 149 at 1, 51-52; Pl. Ex. 7 at 248-52. Samara argues that he, Davis, and Geddes worked very closely during this time to try and settle the case with the Yemeni government. *See* Pl. Exs. 72-89; Pl. Br. at 5-6. After Davis and the Yemeni government failed to reach an agreement, Davis and Manu Patel discussed which attorney should be hired to file the federal lawsuit to enforce the arbitration award. *See* Pl. Ex. 155. Samara contends that it was at this point, in December 1998, that Davis hired Geddes to represent them and to file the federal lawsuit.[5] After the lawsuit was filed, the parties apparently agreed that Geddes would receive a 30% fee for his work. *See* Pl. Ex. 6 at 272-73.

Geddes filed the federal lawsuit on December 18, 1998. *See* Pl. Ex. 147. Samara asserts that Geddes continually sought his help in prosecuting the suit, including serving process and answering questions about foreign law. *See* Pl. Exs. 67-68, 93, 103, 109, 157; Pl. Br. at 7-8, 16-17.[6] Samara also points to his substantial work with Davis after the lawsuit was filed. *See* Pl. Exs. 91-92, 94-100, 104, 106-07, 110-11, 116; Pl. Br. at 8-9. On March 30, 2001, Geddes received a fax and/or e-mail from Davis showing that Samara was to receive 15-20% of any net settlement. *See* Pl. Ex. 117; Ex. 154 at 93. However, Geddes denied that he had an understanding about what Samara was to receive. *See* Pl. Ex. 154 at 92. Samara contends that after the federal judgment on September 11, 2001, Davis and Geddes substantially reduced

---

[5]Samara notes that Davis and Geddes are close friends, and that Geddes had not handled very many plaintiffs' cases during the ten years prior to his filing the federal lawsuit. *See* Pl. Ex. 154 at 7-8, 16, 103.

[6]Samara notes that Geddes claimed that all of his communications were with Davis. *See* Pl. Ex. 154 at 56.

communications with him. *See* Pl. Ex. 3 at 16. Samara asserts that neither Davis nor Geddes sought his approval to settle the amount owed under the judgment. Samara also asserts that Geddes allowed Davis to distribute the settlement proceeds, even though he knew that Samara was owed more than the $1,000,000. Samara notes that he immediately protested to Geddes about receiving only $1,000,000 from the settlement. *See* Pl. Ex. 154 at 155-56. Geddes wrote Samara on November 6, 2001, stating that he could not assist Samara in recovering more of the settlement proceeds from Davis. *See* Pl. Ex. 154, depo. exhibit 4 at 9-10. On November 15, 2001, Samara wrote Geddes, arguing that Geddes had represented both him and Davis as parties to the JVA. *Id.*, depo. exhibit 4 at 12-13.

Geddes testified that it was his understanding that Davis would distribute the proceeds. *See* Pl. Ex. 154 at 97-100. Geddes admitted in his deposition that an attorney acting as the distributing agent would have a duty to disburse the money to appropriate persons, but also testified that he was not acting as a disbursing agent. *See* Pl. Ex. 154 at 114-17. Geddes did communicate with Saeed and the Yemeni government about the settlement, but these communications involved settlement in general, not which persons would receive a distribution of the settlement proceeds. *See* Pl. Ex. 154, depo. exhibits 10, 11. Geddes testified that there was no discussion about how the money was to be distributed. *See* Pl. Ex. 154 at 113-14. Geddes further testified that he felt that he had no duty to protect Samara's interest in the settlement proceeds, even though Davis never assured him that Samara would receive his money. *Id.* at 118-19. Geddes also testified that he would have had no duty toward Samara even if he had known that Davis was going to cheat Samara. *Id.* at 141. Geddes received a letter from Davis on October 10, 2001 showing the final distribution of the settlement proceeds. *Id.* at 150-

51. Geddes neither approved or disapproved of the letter, stating that he was not asked to. *Id.*[7]

### B. Defendants' Statement of Facts

Geddes notes that he has been licensed to practice law for thirty-two years, and that he has been the Chapter 13 trustee for the Northern District of Alabama, Northern Division, since 1978. *See* Def. Ex. A at 7-8. Geddes also has a private practice. *Id.* at 8. Geddes asserts that he was retained by Davis to represent Davis in its dispute with the Yemeni government. *See* Def. Ex. C at ¶ 2. As part of this retention, Geddes and Davis executed a Contract to Employ Attorney ("Attorney Contract") on October 1, 1997. *See* Def. Ex. D. The Attorney Contract provided that Geddes would be entitled to a one-third (1/3) contingency fee from any gross award recovered from Yemen. *Id.* The Attorney Contract was signed by Roy Davis as president of S & Davis International, and Geddes. *Id.* at 5. Samara is not identified as a party to the Attorney Contract, nor did he sign it. *Id. See also* Def. Ex. E at 228.

Geddes also notes that Samara admitted that he had a conversation with Davis and Geddes, in which they agreed that Geddes would be entitled to a 30% fee. *See* Def. Ex. E at 224-25.[8] Samara also admitted that he knew that there was a contract between Geddes and Davis, although he testified that he did not know what the contract said about the fee that Geddes was entitled to. *Id.* at 227. *But see* Third Am. Compl. at ¶ 42 (noting that there was a contract for a "30% fee with Geddes to pay expenses"). Samara admitted that he had no knowledge of the signing of the Attorney Contract, nor did he negotiate its terms. *See* Def. Ex. E at 229.

---

[7]Samara contends that Geddes distanced himself from the settlement distribution in order to avoid being involved in the illegal bribes that were allegedly paid to Saeed. *See* Pl. Br. at 25-27.

[8]Geddes contends that it was actually 33%, but will assume that it was 30% for purposes of these motions.

Geddes contends that he agreed to accept a fee that was less than the 30% he was entitled to, and that he agreed to pay for the expenses out of this share, even though he was not required to. *See* Def. Ex. A at 133-34, 136, 151-52; Def. Exs. D, F. Geddes also contends that he spent thousands of hours on the Yemeni litigation. *See* Def. Ex. A. at 57-58. Samara admitted that Geddes was to receive a 30% fee and that he actually received less than that. *See* Def. Ex. E at 234, 236. Samara stated that the settlement was not a "bad deal," and could not say that the outcome would have been any different if he had been involved in the negotiations. *Id.* at 278-79.

Geddes admits that Samara gave him a copy of the JVA. *See* Def. Ex. A at 45-48, 51. However, he contends that Samara did not provide him with any other information with respect to the JVA. *Id.* at 51, 176; *see also* Def. Ex. E at 250-51. After Samara gave Geddes a copy of the JVA, Davis informed Geddes that the wheat contract was not covered under the JVA. *See* Def. Ex. A at 177-79. Geddes also asserts that after the settlement with the Yemeni government was reached, he prepared the release documents and filed them in accordance with Davis' instructions. *Id.* at 117. Davis was responsible for distributing the settlement funds in accordance with his agreements with other individuals. *Id.* at 99-100. Geddes contends that he did not assume the role of disbursing agent for the settlement funds. *Id.* at 116.

Samara filed his initial complaint on March 19, 2002. As to Geddes, Samara's complaint seeks an accounting and payment to a receiver of amounts owed to him (Count I). He further alleges breach of fiduciary duty (Count III) and seeks a refund of attorney's fees (Count VI). *See* Third Am. Compl.

**SUMMARY JUDGMENT STANDARD**

Summary judgment may be granted based upon facts developed through pleadings, discovery, and supplemental affidavits, etc., if together, they show that there is no genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the initial burden of explaining the basis of his motion. *Celotex*, 477 U.S. at 323. "It is never enough [for the movant] simply to state that the non-moving party could not meet their burden at trial." *Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000) (quotation omitted). The non-moving party then bears the burden of pointing to specific facts demonstrating that there is a genuine issue of fact for trial. *Celotex*, 477 U.S. at 324. The non-moving party "must either point to evidence in the record or present additional evidence 'sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.'" *Hammer v. Slater*, 20 F.3d 1137, 1141 (11th Cir. 1994) (quotation omitted). Summary judgment is required where the non-moving party merely repeats its conclusory allegations, unsupported by evidence showing an issue for trial. *Comer v. City of Palm Bay*, 265 F.3d 1186, 1192 (11th Cir. 2001) (citation omitted).

Summary judgment will not be granted until a reasonable time has been allowed for discovery. *Comer*, 265 F.3d at 1192. Moreover, "[w]hen deciding whether summary judgment is appropriate, all evidence and reasonable factual inferences drawn therefrom are reviewed in a light most favorable to the non-moving party." *Korman v. HBC Florida, Inc.*, 182 F.3d 1291, 1293 (11th Cir. 1999). Finally, the trial court must resolve all reasonable doubts in favor of the non-moving party, although it need not resolve all doubts in a similar fashion. *Earley v.*

*Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990).

## ARGUMENTS

### I. Plaintiffs' Position

Samara argues that Geddes was acting as his attorney in connection with this matter, and thus he sues Geddes for failing to protect Samara's share of the settlement, for failing to clarify his role with Samara, and for failing to warn Samara that he was not going to protect the latter's share of the settlement. Samara cites the Alabama Legal Services Liability Act ("ALSLA"), which contains the following definitions:

> (3) STANDARD OF CARE.
> a. The standard of care applicable to a legal service provider is that level of such reasonable care, skill, and diligence as other similarly situated legal service providers in the same general line of practice in the same general locality ordinarily have and exercise in a like case.
>
> . . .
>
> (4) BREACH OF THE STANDARD OF CARE. The failure by a legal service provider to comply with the applicable standard of care the breach of which proximately causes the injury or damages or wrongful death.

Ala. Code § 6-5-72. Samara contends that the elements of a legal malpractice action are the same as those of an ordinary negligence action. *See Herston v. Whitesell*, 348 So. 2d 1054, 1057 (Ala. 1977) ("The elements of an action against an attorney in his professional capacity for negligence are essentially no different from those of any other negligence suit."). Samara also argues that, assuming Geddes was not his attorney, there could still be liability under the common law. *See Cunningham v. Langston, Frazer, Sweet & Freese*, 727 So. 2d 800 (Ala. 1999) ("Therefore, we conclude, from the language of the statute, that the ALSLA does not apply to an action filed against a 'legal service provider' by someone whose claim does not arise out of

9

the receipt of legal services.").

Samara also argues that, even though he is claiming privity with Geddes through Davis, the JVA, and the conference call in which the parties agreed to a 30% contingency fee, privity of contract is not required for a legal malpractice claim. Samara cites *Williams v. Jackson Co.*, 359 So. 2d 798 (Ala. Ct. App. 1978), in which the court stated that

> Privity of contract is not a required basis of duty in such cases. It has now been expressly stated by our supreme court that duty may arise from a social relationship as well as from a contractual relationship; that a duty to use care may arise from the reasonable man test of foreseeability of injury. . . . Thus one who undertakes to perform a contract may be determined to owe a duty to others not privy to the contract to perform his obligations under the contract without negligent injury to such others. Such duty may arise from the foreseeability that such others may be injured by negligent performance, or duty may arise from the knowledge that others are relying upon a proper performance.

*Id.* at 801. *See also Harvard v. Palmer & Baker Eng'rs, Inc.*, 302 So. 2d 228 (Ala. 1974), *overruled on other grounds by Ex parte Ins. Co. of North America*, 523 So. 2d 1064 (Ala. 1988).

Further, Samara argues that although expert testimony is generally required in a legal malpractice case, it is not always required. To support this proposition, Samara cites *Ex parte HealthSouth Corp.*, No. 1011582, 2002 WL 31663618 (Ala. Nov. 27, 2002). In *Ex parte HealthSouth*, a medical-malpractice case, the court held that

> As a general rule, in a medical-malpractice action, the plaintiff is required to produce expert medical testimony to establish the applicable standard of care and a breach of that standard of care, in order to satisfy the plaintiff's burden of proof. However, "[a]n exception to this rule exists 'in a case where want of skill or lack of care is so apparent . . . as to be understood by a layman, and requires only common knowledge and experience to understand it.'"
>
> . . .
>
> A plaintiff need not offer testimony of an expert witness in a medical-malpractice case (a) when the act or omission is in a class of cases "'where want

>of skill or lack of care is so apparent . . . as to be understood by a layman, and requires only common knowledge and experience to understand it,'" such as when a foreign object is left in, the wrong body part is operated on, or a call for assistance is ignored for an unreasonable time; or (b) when a plaintiff either relies on "a recognized standard or authoritative medical text or treatise," or is himself a qualified medical expert.

*Id.* at *3, *9. Samara acknowledges that these exceptions have not yet been addressed in the legal malpractice area, but argues that the trend is to recognize the same exceptions in both areas. *See* Wilburn Brewer, Jr, *Expert Witness Testimony In Legal Malpractice Cases*, 45 S.C. L. Rev. 727 (1994). Samara also argues that no expert would be needed if his claims proceeded under the common law.

Samara next argues that Davis and Geddes backdated the Attorney Contract to October of 1997, in an attempt to demonstrate that Geddes handled the GAFTA appeal. Samara argues that the two copies of the Attorney Contract produced by Samara have different signatures and different stamps. *See* Pl. Exs. 156a, 156b. By contrast, Samara notes that Geddes was simply involved in preparing some papers for the GAFTA appeal, and argues that it would be illogical to give someone a 1/3 contingency fee for preparing paperwork. Samara also notes that Manu Patel stated that he and Jim Miller were the attorneys for Davis during the GAFTA appeal. *See* Pl. Ex. 155. Samara also notes the correspondence between Davis and Geddes demonstrating that Geddes did not begin to represent Davis until December 1998. *See* Pl. Exs. 84, 160.

Next, Samara cites Alabama Rule of Professional Conduct 1.13, which states, in part, that

>(a) A lawyer employed or retained by an organization represents the organization acting through its duly authorized constituents.

>(b) If a lawyer for an organization knows that an officer, employee or other person associated with the organization is engaged in action, intends to act or refuses to act in a matter related to the representation that is a violation of a legal obligation

11

> to the organization, or a violation of law which reasonably might be imputed to the organization, and is likely to result in substantial injury to the organization, the lawyer shall proceed as is reasonably necessary in the best interest of the organization. In determining how to proceed, the lawyer shall give due consideration to the seriousness of the violation and its consequences, the scope and nature of the lawyer's representation, the responsibility in the organization and the apparent motivation of the person involved, the policies of the organization concerning such matters and any other relevant considerations. Any measures taken shall be designed to minimize disruption of the organization and the risk of revealing information relating to the representation to persons outside the organization.
>
> . . . .
>
> (d) In dealing with an organization's directors, officers, employees, members, shareholders or other constituents, a lawyer shall explain the identity of the client when the lawyer knows or reasonably should know that the organization's interests are adverse to those of the constituents with whom the lawyer is dealing.

Samara also cites Comment 7 to Rule 1.13, which states that

> There are times when the organization's interest may be or become adverse to those of one or more of its constituents. In such circumstances the lawyer should advise any constituent, whose interest the lawyer finds adverse to that of the organization of the conflict or potential conflict of interest, that the lawyer cannot represent such constituent, and that such person may wish to obtain independent representation. Care must be taken to assure that the individual understands that, when there is such adversity of interest, the lawyer for the organization cannot provide legal representation for that constituent individual, and that discussions between the lawyer for the organization and the individual may not be privileged.

Finally, Samara argues that Geddes had a non-delegable duty to ensure that the settlement proceeds were distributed to the proper parties. *See generally Gonzalez, LLC v. DiVincenti*, Nos. 1010015, 1011011, 2002 Ala. LEXIS 278 (Ala. Sept. 13, 2002) (discussing non-delegable duty in context of a inspection and repair contract). Samara also contends that privity of contract is not required for a non-delegable duty to be enforceable. *See Fuller v. Tractor & Equip. Co.*, 545 So. 2d 757, 759 (Ala. 1989) ("Alabama courts have rejected the absence of privity of contract as

a defense under appropriate facts."). Samara also cites *Johnson v. Cunningham*, 1 Ala. 249, 1840 WL 141 (1840), in which the court stated that "an attorney at law, in virtue of his ordinary powers, cannot delegate his authority to another, so as to raise a privity between such third person, and his principal; or to confer on him, as to the principal, his own rights, duties and obligations." *Id.* at *6. Here, Samara argues, Geddes cannot delegate his most basic duty, i.e., distributing settlement proceeds to a client or a third party in interest.

## II. Defendant's Response

Geddes argues that the claims against him should be dismissed because it is undisputed that he was to receive 30% of the settlement with Yemen, and that in fact he accepted less than that amount. Samara himself conceded that Geddes only received 25% of the settlement, and that he never paid Geddes any money out of his own pocket. *See* Def. Ex. E at 234-36. Geddes also notes that Count I of the complaint states that Samara is entitled to 50% of the settlement after the deduction of attorney's fees. Geddes asserts that since he was entitled to more than he actually received, and since there is no dispute that his fee was to come off the top, Counts I and VI must be dismissed.

Geddes next argues that Samara's claims are clearly governed by the ALSLA, because Samara's position is basically that Geddes was the attorney for both him and Davis with respect to the Yemen litigation. Geddes notes that under Alabama law, the ALSLA is the "only one form and cause of action against legal service providers in courts of the state of Alabama." Ala. Code § 6-5-573. *See also* Ala. Code § 6-5-572(1) (defining "Legal Service Liability Action"); *Sessions v. Espy*, No. 1010329, 2002 WL 31224433 (Ala. Oct. 4, 2002) (attached to defendant's brief as Exhibit 2). Geddes acknowledges that under the ALSLA a plaintiff "must prove,

13

basically, the same that must be proven in an ordinary negligence suit." *Lightfoot v. McDonald*, 587 So. 2d 936, 937 (Ala. 1991). Therefore, Geddes argues, Samara must prove (1) the existence of a duty, (2) breach of that duty, (3) proximate causation of injury by the breach, and (4) damages. *See Independent Stave Co. v. Bell, Richardson & Sparkman, P.A.*, 678 So. 2d 770, 772 (Ala. 1996). As part of this burden, Geddes contends, Samara must prove that "but for" Geddes' alleged conduct, he would not have suffered any damage. *Id.* at 772.

First, Geddes argues that he owed no duty to Samara, a fact that he argues would defeat all of Samara's claims against him. Geddes contends that an attorney's liability for negligence in handling a legal matter must arise from an attorney-client relationship, either contractual or gratuitous in nature. *See Peterson v. Anderson*, 719 So. 2d 216, 218 (Ala. Civ. App. 1997). As noted by the Alabama Supreme Court, "in the absence of an express contract, the courts are reluctant to construe contractual dealings and services of lawyers . . . as implying a contract of guaranty or insurance of favorable results." *Broyle v. Brown Eng'g Co.*, 151 So. 2d 767, 771 (Ala. 1963). *See also Robinson v. Benton*, No. 1010167, 2002 WL 1044713 at *7 (Ala. May 24, 2002) (attached to defendant's brief as Exhibit 1). Here, there was no privity of contract, as Geddes was retained by Davis, not Samara. *See* Def. Ex. C; Ex. D at 5. Samara is not identified as a party to the Attorney Contract, nor did he sign it. *See* Def. Ex. D at 5; Ex. E at 228-29. Nor is there any evidence that Geddes gratuitously undertook to represent Samara. *See* Def. Ex. A at 177-79. Because there was no duty, Geddes argues, the claims against him must be dismissed.

Geddes also argues that Samara has failed to provide any evidence that his legal services failed to meet the standard of care. Geddes argues that a plaintiff must produce expert testimony that the defendant's legal services were below the standard of care. *See Tonsmiere v. AmSouth*

14

*Bank*, 659 SO. 2d 601, 605 (Ala. 1995). Geddes contends that the Alabama Supreme Court has affirmed this principle time and again. *See, e.g., Green v. Ingram*, 794 So. 2d 1070 (Ala. 2001); *Tidwell v. Waldrop*, 554 So. 2d 1009 (Ala. 1989). Geddes notes that Samara has failed to disclose an expert to be used at trial, even though discovery closed on December 15, 2002. Thus, Geddes asserts, Samara has failed to produce expert testimony and his claims are due to be dismissed.[9]

Finally, Geddes argues that Samara has failed to show that Geddes proximately caused his damages, under a "but for" analysis. Here, the dispute with Yemen settled for $16,325,000, and amount which Samara admitted was "not bad" and not a "bad deal." *See* Def. Ex. E at 278-79. According to Geddes, Samara simply cannot show that but for Geddes' alleged misconduct, the outcome of the litigation or the settlement would have been different.

### III. Plaintiffs' Reply

Samara again argues that the Alabama Supreme Court would recognize "common sense" exceptions to the requirement that a plaintiff must produce expert testimony in a malpractice case. He argues that if an attorney stole money or forget to file a lawsuit before the statute of limitations lapsed, then Alabama courts would surely suspend the requirement of expert testimony. Samara contends that a attorney's failure to deliver settlement proceeds to the correct persons would be a similar "common sense" case.

Samara also re-cites the cases concerning non-delegable duty and privity of contract. Samara argues that Geddes owed him a duty because Geddes represented Samara by virtue of the JVA, Geddes led Samara to believe that he represented him, Geddes knew that Samara was

---

[9] In a footnote, Geddes also asserts that his performance met the standard of care. *See* Def. Br. at 11 n.5.

entitled to a larger share of the settlement, and it was foreseeable that Samara would be harmed if Geddes allowed Davis to distribute the settlement proceeds. Samara argues that Geddes breached that duty by failing to protect his share of the settlement proceeds, by failing to warn Samara that he was not going to protect Samara's share, and by failing to clarify his role with regards to Davis and Samara.

### IV. Defendant's Reply

Again, Geddes notes that Samara, in his complaint, states that he is entitled to 50% of the settlement proceeds "after deduction of attorney's fees." *See* Third Am. Compl. at ¶ 17. Thus, any claim seeking a refund of Geddes' fee is moot because Samara admits that Geddes was entitled to a 30% fee for his work. *See* Def. Ex. E at 224-25, 227.

Geddes also disputes that he and Davis backdated the Attorney Contract. Geddes argues that the only shred of evidence to support this claim is affidavit of Manu Patel, which Geddes argues should be stricken. Geddes has filed a motion to strike (Doc. 89), arguing that the affidavit is full of speculation, hearsay, and irrelevant statements.[10] Moreover, Geddes argues, the dispute over when the agreement was signed is a red herring, because there is no dispute that it in fact was signed. Thus, Geddes contends, Counts I and VI should be dismissed.

Geddes also argues that Count III should be dismissed, because he owed no duty to Samara. In addition to his initial arguments, Geddes addresses Samara's claim that recovery is possible under a common-law theory, as opposed to the ALSLA. Geddes contends that Samara's claims are unequivocally governed by the ALSLA. Geddes also contends that the cases cited by Samara to support his common-law argument are misplaced. In *Carmichael*, Geddes notes, the

---

[10]Samara has filed a response (Doc. 91), arguing that the statements are not hearsay.

Alabama Supreme Court specifically held that claims against attorneys are outside the scope of the ALSLA if they are "not related to [their] activities in providing legal services." 737 So. 2d at 804. Geddes argues that *Carmichael* applies to situations in which an attorney is involved in an automobile accident, an assault, or a fee splitting dispute, the latter of which occurred in *Carmichael*. In *Williams*, Geddes contends, the language cited by Samara was with respect to the defendant extermination company, not the defendant attorney. *See* 359 So. 2d at 801. Indeed, the court in *Williams* stated that "one authorized to practice law owes no duty except that arising from contract or from a gratuitous undertaking." *Id.* at 800.

Finally, Geddes address Samara's argument with respect to the need for expert testimony in a legal malpractice case. He notes that no court has applied *Ex parte HealthSouth Corp.* to cases arising under the ALSLA, and that even if its logic is applied, this case in not synonymous with the types of "common sense" examples articulated in *Ex parte HealthSouth Corp.*, i.e., a foreign object left in the body or an operation on the wrong body part. Geddes also notes that Alabama Rule of Professional Conduct 1.13, cited by Samara, has no impact on this case. *See* Ala. Code § 6-5-578(b) ("the fact that a legal service provider violated any provision of the rules of professional conduct shall not give rise to an independent cause of action or otherwise be used in support of recovery in a legal services liability action"); *Ex parte Toler*, 710 So. 2d 415, 416 (Ala. 1998) ("We hold that a violation of the Rules of Professional Conduct may not be used as evidence, regardless of whether the attorney has been charged with a violation of those Rules.").

## CONCLUSIONS OF THE COURT

There is no substantial evidence that Geddes had an attorney-client relationship with plaintiffs. His only contract was with Davis. Samara was not a plaintiff in the federal action

brought by Geddes. Geddes's only client received the proceeds. Geddes had no authority to distribute funds to a non-client. See Rule 1.13 Alabama Rules of Professional Conduct; *Hopper v. Frank*, 16 F.3d 92 (5th Cir. 1994); *Turkey Creek, LLC v. Rosania*, 953 P.2d 1306 (Col. Ct of App 1998); and *In Re: Valero Energy Corp, et.al. Relators*, 973 S.W.2d 453 (Ct of App Texas 1998).

The motion for summary judgment filed by the plaintiffs will be denied. The motion for summary judgment filed by Geddes will be granted.

This the 24th day of June, 2004.

/s/ Robert B. Propst
**ROBERT B. PROPST**
**SENIOR UNITED STATES DISTRICT JUDGE**