FILED

2010 Nov-17  PM 04:30
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

|  |  |  |
|---|---|---|
| TAZEWELL T. SHEPARD, as Trustee for The Chapter 7 Estate of Strickland & Davis International, Inc., and A. M. SAMARA a/k/a SAMARA CONSULTANT GROUP, | } } } } } } | |
|      Plaintiffs, | } } | Case No.: 4:02-cv-707-RDP |
| v. | } } | |
| STRICKLAND & DAVIS INTERNATIONAL, INC., d/b/a S & DAVIS INTERNATIONAL, INC., ROY DAVIS, and STRICKLAND & DAVIS INTERNATIONAL DISC CORPORATION, NATIVE AMERICAN DEVELOPMENT, LLC, VONCILE DAVIS, CINDY DENISE TAYLOR, | } } } } } } } } } } } | |
|      Defendants. | } } | |

### MEMORANDUM OPINION

The court has before it the May 18, 2010 Motion for Summary Judgment (Doc. #457) of

Defendant Christian & Small, LLP ("Christian & Small"), the May 20, 2010 Motion for Summary

Judgment (Doc. #459) of Defendants Roy Davis ("Davis"), Strickland & Davis International DISC

Corporation ("DISC"), Native American Development, LLC ("Native American"), Cindy Denise

Taylor ("Taylor"), Voncile Davis ("V. Davis"), David Wayne Davis (D. Davis"), and Melissa

Suzanne Terrel ("Terrel") (collectively referred to herein at times as the "Davis Defendants"), and

the May 21, 2010 Motion for Summary Judgment (Doc. #460) Against All Defendants filed by the

Plaintiff, Tazewell T. Shepard, as Trustee for the Chapter 7 estate of Strickland & Davis

International, Inc. and A.M. Samara a/k/a Samara Consultant Group.[1]  Pursuant to the court's orders of February 10 and 25, 2010,  the motions (Docs. # 457, 459, 460) are under submission and are considered herein without oral argument.

Having considered all briefing and evidentiary submissions, the court finds that Christian & Small's Motion for Summary Judgment (Doc. #457) is due to be granted; the Davis Defendants' Motion for Summary Judgment (Doc. #459) is due to be denied; and the Trustee's Motion for Summary Judgment (Doc. #460) is due to be granted in part and denied in part.

## I.    Procedural History

Plaintiffs Samara Consultant Group and A.M. Samara commenced this action on March 19, 2002 by filing a complaint (Doc. #1) in the Northern District of Alabama against S&Davis International, Inc., Roy Davis, Voncile Davis, David W. Davis, Phillip A. Geddes, and Strickland & Davis International DISC Corporation for: Accounting and Payment to Receiver (Count I – against all Defendants); Breach of Contract (Count II – against Roy Davis and S&Davis International); Breach of Fiduciary Duty (Count III – against all Defendants); and Misrepresentation (Count IV – against Roy Davis and S&Davis International).  Since the original filing, the complaint has been amended no less than six times over the course of eight years.  The Sixth Amended Complaint[2] is

---

[1]Also before the court is the Motion to Strike (Doc. #471) filed by Christian & Small on June 9, 2010.  The motion (Doc. #471) moves the court to strike and refuse consideration of Samara's Response to Summary Judgment Motion of Christian & Small (Doc. #469) and exhibits thereto as non-compliant with the court's orders on summary judgment requirements.  While the court agrees that the response is almost wholly deficient, the motion (Doc. #471) to strike is **DENIED**.  However, the response (Doc. #469) will be considered by the court only where sections are compliant with the court's orders on summary judgment requirements.

[2]One of the Davis Defendants' primary arguments in support of their own motion for summary judgment is that the Sixth Amended Complaint is barred by principles of res judicata.  (*See* Doc. #459-2 at 12-14).  That argument has already been considered and rejected by this court and

2

brought by Tazewell T. Shepard, as trustee for the Chapter 7 estate of Strickland & Davis, International, Inc.,[3] and A.M. Samara a/k/a Samara Consultant Group for: General Assignment of Debtor's Property Inures to all Creditors under State Law (Count One); Fraudulent Transfers under State Law (Counts Two, Three, Four, Five); Prejudgment Interest on Preferential or Fraudulent Transfers under Bankruptcy Code (Count Six); Subordination of Claims under Section 510(c) (Count Seven); Turnover of Property of Estate (Count Eight); Authority for Trustee to Liquidate Assets (Count Nine); Demand for Turnover of Records and Accounting (Count Ten); Unjust Enrichment (Count Eleven); Prejudgment Interest on Preferential or Fraudulent Transfers under State Law (Count Twelve); Accounting against Strickland & Davis International, Inc., Strickland & Davis International DISC, Inc., and Davis (Count Thirteen); Breach of Contract Against Davis and Strickland & Davis International (Count Fourteen); Alter Ego against DISC Corporation and Davis (Count Fifteen); Subsequent Corporate Liability against DISC Corporation (Count Sixteen); Instrumentality Doctrine against DISC Corporation (Count Seventeen); Conversion against Davis, the DISC Corporation and the Native American Development, LLC (Count Eighteen); Fraudulent Transfers against Native American Development, LLC, Voncile Davis, Cindy Denise Taylor, Melissa Suzanne Terrel, David Wayne Davis and Strickland & Davis International DISC Corporation (Count Nineteen); Claim against Christian & Small for Money Paid in Violation of

---

the court declines to revisit that decision.  (*See* Doc. # at 26-30) ("In this case, there is simply no prior final judgment on the merits that meets the first element required by *Ragsdale* . . . Never has the necessary language, required by Rule 54(b), been incorporated into any order or applied to any party or any claim other than those adjudicated by the jury between Samara and International."). This same analysis applies to the Davis Defendants' arguments relying upon the law of the case doctrine.

[3]The recovery is sought for A.M. Samara, who is believed to be the only creditor of the bankrupt corporation.  No other creditor is named in the complaint.  (*See* Docs. #414, 423, 443).

Court Rules (Count Twenty); and Contempt of Court Order (Count 21 – against Christian & Small). (Docs. #414, 437).

The parties have filed briefs and submitted evidence in support of their respective positions concerning the pending motions for summary judgment.  On May 18, 2010, Christian & Small submitted evidence[4] (Doc. #458, Exhs. 1-7) in support of its motion (Doc. #457) for summary judgment and also filed a supporting brief (Doc. #458).  A.M. Samara a/k/a Samara Consultant Group filed a Response (Doc. #469) to the Summary Judgment Motion of Christian & Small on June 8, 2010 and attached thereto: an invoice summary sent to Roy Davis as President of Native American Development, LLC by Christian & Small (Exhibit 1); the Order Regarding Constructive Trust (Exhibit 2); the first June 8, 2010 affidavit of Myron K. Allenstein (Exhibit 3); and the second June 8, 2010 affidavit of Myron K. Allenstein (Exhibit 4).  Plaintiff Trustee filed a Response (Doc. #470) to the Motion for Summary Judgment filed by Christian & Small, LLP on June 8, 2010 and Christian & Small filed its Reply Brief (Doc. #476) on June 17, 2010.

On May 20, 2010, the Davis Defendants filed a Motion for Summary Judgment (Doc. #459), and attached thereto evidence[5] (Doc. #459-1) and a supporting brief (Doc. #459-2).  On June 10,

_____

[4]Defendant Christian & Small submitted the following Rule 56 evidence: the affidavit of Richard E. Smith (Exhibit 1); the affidavit of Deborah A. Smith (Exhibit 2); the affidavit of Ahrian Tyler Dudley (Exhibit 3); the affidavit of Clark E. Cooper (Exhibit 4); the deposition of Roy Davis (Exhibit 5); the deposition of David Davis (Exhibit 6); and the deposition of Richard E. Smith (Exhibit 7).

[5]The Davis Defendants submitted the following Rule 56 evidence: the affidavit of Roy Davis (Exhibit 1); Minutes of November 21, 1998 Special Meeting of Board of Directors (Exhibit A to Exhibit 1); Waiver of Notice November 21, 1998 Special Meeting (Exhibit B to Exhibit 1); November 21, 1998 Contract of Assignment between S&Davis International, Inc. and S&Davis International DISC, Inc. (Exhibit C to Exhibit 1); October 15, 2001 bank records of S&Davis International DISC, Inc. (Exhibit D to Exhibit 1); wire confirmation of $1,000,000.00 transfer to Plaintiff Samara (Exhibit E to Exhibit 1); March 3, 2003 Order of Court granting partial summary

4

2010 Plaintiff Trustee filed a Response (Doc. #473) to the Davis Defendants' Motion for Summary

Judgment, and on June 21, 2010 the Davis Defendants filed a Reply (Docs. #477, 478).

The final Motion for Summary Judgment (Doc. #460) was filed by the Trustee against all

Defendants on May 21, 2010.  The Trustee filed a Brief (Doc. #461) in support of its motion for

summary judgment and on the same date filed supporting evidence[6] (Docs. #462-468).  The Davis

Defendants filed a Response (Doc. #474) to the Trustee's motion for summary judgment on June 10,

2010.  Christian & Small filed a Response (Doc. #472) to Plaintiff's Motion for Summary Judgment

on June 9, 2010.

---

judgment for defendants (Exhibit F to Exhibit 1); and October 19, 2006 Judgment from U.S. Court
of Appeals for the Eleventh Circuit (Exhibit G to Exhibit 1).

[6]Plaintiff Trustee submitted the following Rule 56 evidence: S&D International bank account
#18517631 statement 10/31/01 (5 pages) showing deposit of settlement of $10,453,865.75 and
disbursements (Exhibit A); Records of Franklin Templeton Funds for Roy & Voncile Davis showing
two purchases totaling $1,000,000 on 11/29/01 and $1,750,000 on 2/27/02 and interest payments of
$4,278.54/month and $4,068.79/month (Exhibit B); Records of Roy Davis' checking account
#18852236 showing deposits of interest of Franklin Templeton Funds beginning March 2002 and
deposits of Franklin Templeton Fund principal withdrawals (Exhibit C); excerpts of transcript of the
preliminary hearing injunction on 4/1/02 before Judge Propst (Exhibit D); monthly statements of
checking account #47791 of Voncile Davis and Suzanne Terrel showing monthly interest payments
from Franklin Templeton of $100,200.48 and showing deposits (Exhibit E); ING Financial
Investment Account Records showing investment of $700,000 into ING account on 10/13/03 by Roy
Davis which originated from the 10/9/03 withdrawal from Franklin Templeton (Exhibit F); excerpts
of transcript of 5/17/04 hearing before Magistrate Judge Putnam (Exhibit G); First Metro Bank
records for Native American Development, LLC checking account #48615 showing payments to
Christian & Small totaling $111,705.75 and showing deposits (Exhibit H); Judge Propst's order of
6/22/04 prohibiting defendants from transferring any money or assets without express permission
of the Court (Exhibit I); Magistrate Judge Putnam's 7/1/04 Report and Recommendation (Exhibit
J); final judgment entered 11/17/04 by District Court ordering defendants to pay $1,258,747.52 plus
10% surety (Exhibit K); schedule of payments received and amounts billed by Christian & Small,
LLP in connection with this case (Exhibit L); deposition of Roy Davis taken 2/17/2010 (Exhibit M);
deposition of Voncile Davis taken 4/28/2010 (Exhibit N); deposition of David D. David taken
2/17/2010 (Exhibit O); deposition of Cindy Taylor taken 2/17/2010; deposition of Richard Smith
taken 4/23/2010 (Exhibit Q); and deposition of Suzanne Terrel taken 2/17/2010 (Exhibit R).

## II.     Legal Standards for Evaluating a Summary Judgment Motion

In accordance with Federal Rule of Bankruptcy Procedure 7056, which incorporates Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *See id.* at 323. Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *See id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

The method used by the party moving for summary judgment to discharge her initial burden depends on whether that party bears the burden of proof on the issue at trial. *See Fitzpatrick*, 2 F.3d at 1115-17 (citing *United States v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991)(en

banc)).  If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; *i.e.*, facts that would entitle it to a directed verdict if not controverted at trial.  *See Fitzpatrick*, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial. The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to *affirmatively* show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires that the movant point out to the district court that there is an absence of evidence to support the non-moving party's case. *See Fitzpatrick*, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest

7

on mere allegations, but must set forth evidence of specific facts. *See Lewis v. Casey*, 518 U.S. 343, 358 (1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

## III.   Relevant Undisputed Facts[7]

### A.   Background Facts[8]

The genesis of this case is a failed international transaction between the Republic of Yemen and a joint venture[9] by Strickland & Davis International, Inc. d/b/a S & Davis International, Inc. (at times referred to herein as the bankruptcy "debtor" and/or "International") and plaintiffs A.M. Samara and Samara Consultant Group,[10] a corporation (collectively referred to herein as "Samara"). Yemen defaulted on the contract that International had entered into with the country. The resulting breach of contract dispute was arbitrated by the Grain and Feed Trade Association ("GAFTA") in London, England. An award was rendered in favor of International on June 5, 1998 in the amount of $17,310,000.00. In September 2001, after having to file an action in the Northern District of Alabama for judgment on the arbitration award (Case No. CV-98-J-3141-NW), a judgment was entered in favor of International for $27,150,315.53, which judgment confirmed the arbitration award and awarded interest from July 4, 1998 until September 11, 2001. International then settled all

---

[7]If the facts are in dispute, they are stated in the manner most favorable to Plaintiffs. *Fitzpatrick*, 2 F.3d at 1115.

[8]Because these background facts are ancillary to the questions presented by the pending motions, they are stated here with some brevity. A complete recitation of the history of this case is available, and incorporated herein by reference, in the court's Memorandum Opinion (Doc. #435) dated June 5, 2009.

[9]The Davis Defendants deny, without any citation to the record, that the transaction was one of "joint venture." (*See* Doc. #474 at 2, ¶ 1).

[10]That there was ever a joint venture is something the Davis Defendants continue to deny. (*See* Doc. #474 at 2, ¶ 1).

claims with the Republic of Yemen for $16,325,000.00. International forwarded Samara $1,000,000.00 as a partial payment.

On March 19, 2002 Samara filed suit against International, DISC, Davis, Davis' wife, Davis' son, and attorney Phillip Geddes in the current civil action, claiming that Samara was owed a portion of the original arbitration settlement of $27,150,315.53 and seeking a preliminary injunction restraining Defendants from disposing of any assets and requiring them to deposit the sums sought with a receiver pending the resolution of the action. The preliminary injunction sought by Samara was denied by Judge Propst. On December 16, 2002, Samara filed a motion for summary judgment against Defendants International and Davis for one half of the net distribution of the settlement and minus the million dollars already received for a total amount sought of $2,109,512.50. Defendants International and Davis also filed a motion for summary judgment. On March 3, 2003, Judge Propst denied Samara's motion in full and denied Davis' motion with respect to Samara's claims for an accounting and breach of contract, but granted Davis' motion with respect to all other claims. The case proceeded to trial on Counts I and II against International, Davis, DISC, and Geddes. At the close of the evidence the court granted a Rule 50 motion filed by Davis, and dismissed Davis as a party.

On April 21, 2004, the jury returned a verdict in favor of Samara in the amount of $1,075,851.27. On April 22, 2004 Judge Propst entered an interlocutory judgment in favor of A.M. Samara and against International in that amount, pending issues of interest on the jury verdict. On April 26, 2004 Samara filed a motion for accounting of all disbursements and income derived from proceeds of the settlement between International and the Republic of Yemen and a motion for additur. The motions were referred to Magistrate Judge Putnam.

On June 15, 2004, Judge Propst imposed a constructive trust "as to the corporate defendants"[11] and referred the issue as to Davis himself to the Magistrate. Davis and DISC requested reconsideration of the order imposing the constructive trust. Defendants argued that they were essentially dismissed from the case when the court granted summary judgment to defendants on all claims but I and II. Defendants also moved the court to reconsider its referral of the constructive trust issue regarding Davis, arguing that Davis was dismissed from the case at trial and therefore, the court did not have jurisdiction to impose a constructive trust upon him without violating due process. On June 24, 2004, the Magistrate Judge entered an order allowing the parties to file matters in support of or in opposition to the Motion to Reconsider and/or Clarify by no later than July 2, 2004. On July 1, 2004, before the defendants had submitted their opposition petition, Judge Putnam entered his Report and Recommendation, recommending a constructive trust be imposed on all three of the parties who were or had been defendants, whether or not they had already been dismissed with prejudice.[12] Defendants objected to the Report and Recommendation. Judge Propst accepted and adopted the Report and Recommendation on July 27, 2004.

On September 7, 2004, Judge Propst entered a final judgment on the jury's verdict and certified it under Federal Rule of Civil Procedure 54(b). The parties agreed that the amount of prejudgment interest should be calculated at 6% per annum making the total judgment $1,264,125.47 and reserving for later disposition the issues against Davis and DISC. The court indicated that, to

---

[11]It is unclear whether Judge Propst intended to include DISC as one of the corporate defendants referenced in the order, since the parties and Judge Propst have sometimes grouped DISC with Davis rather than with the corporate defendants.

[12]In his Report and Recommendation on this issue, Judge Putnam observed: "Certainly, the jury's verdict has now determined that not only was the plaintiff [Samara] a partner with S&Davis in a joint venture, but that the joint venture included the Yemen wheat deal." (Doc. #187 at 7).

the extent DISC and Davis were earlier dismissed as parties, said dismissals related only to the legal claims subject to the jury verdict.

On November 17, 2004 Judge Propst adopted Samara's proposed final judgment order granting interest for 34 months (rather than the 35 indicated by previous order) bringing the total judgment for Samara to $1,258,747.57.  The court imposed a constructive trust on Davis and DISC, ordering Davis to individually pay the amount of the judgment and accrued interest to the Clerk of Court within seven days.  (*See* Doc. #213).  Following a Motion to Alter or Amend, and after a telephone conference with counsel, the court entered a "consent amendment to final judgment" on December 6, 2004.

Davis and DISC appealed the judgment (as amended) against them.  (*See* Doc. #218).  A succession of motions and an appeal to the Eleventh Circuit examined several questions, including whether the court could impose a constructive trust on the arbitration proceeds and whether the remaining funds were segregated and protected from dissipation.  Opposition to the imposition of a constructive trust was filed, alleging that because: (a) Davis and DISC were no longer parties defendant, no constructive trust could be imposed on them; and (b) the court had ruled there had been no fraudulent transfer, the prerequisite for imposition of such a trust was lacking.  On October 19, 2006, the Eleventh Circuit vacated the judgment imposing a constructive trust on Davis and DISC, and remanded the case.  (*See* Doc. #314).  The court of appeals expressed three areas of concern related to the November 17, 2004 judgment.  First, the court was concerned with whether Davis and DISC were afforded a fair opportunity to defend against the imposition of a constructive trust as the recipients of fraudulent conveyances or otherwise wrongful transfers.  Though the court noted that Davis and DISC's due process rights may have been transgressed, it expressed no opinion

11

on the issue; rather, it concluded that fairness required that Davis and DISC be afforded an

opportunity to be put on notice of the claim against it, and submit both factual and legal arguments

to the court in their defense.  Second, the court of appeals noted its concern that the district court

never explained its rationale for setting aside the previous judgments against Davis and DISC.

Finally, the Eleventh Circuit was of the opinion that the briefing before it was inadequate to

determine whether Alabama law would warrant the imposition of a constructive trust in this

situation.

On January 29, 2008, the debtor filed a Chapter 7 bankruptcy case, and on January 30, 2008

the Bankruptcy Court appointed Tazewell Shepard as Trustee for International.  The Trustee entered

the civil action between Samara and the debtor as a Plaintiff and filed a Sixth Amended Complaint,

which named additional defendants, including claims against the law firm of Christian & Small,

LLP.  The Trustee's complaint asserted state fraudulent conveyance claims against Defendants

pursuant to the Trustee's powers under 11 U.S.C. § 544(b).

On June 5, 2009, this court set aside the rulings entered by Judges Propst and Putnam

purportedly dismissing Davis and DISC as defendants.[13]  (*See* Docs. #435, 436).  All previous orders

that were not a final judgment, and to the extent they purported to dismiss any Defendant named in

_____

[13]Unfortunately for the court and for all parties involved, the court is unable to borrow much reasoning from the orders entered by previous judges handling this case.  Although summary judgment was entered at one point in favor of DISC, it was done without much, if any, explanation, referencing only a preliminary injunction transcript.  (*See* Doc. #472 at 9).  The purpose of this court vacating prior judgments was to explore the record for itself and to remedy the Eleventh Circuit's concern that certain of the Defendants' due process rights may have been violated with the imposition of the constructive trust.  With the pending motions for summary judgment, no party has moved for imposition of a constructive trust.  Instead, the parties have focused on the more primary question of whether the transfers were fraudulent in the first place.  By giving the parties the opportunity to explore the issue of fraudulent transfers, this court has sought to satisfy the Eleventh Circuit's concerns regarding due process.

the Sixth Amended Complaint, the dismissals were vacated.  (*See* Docs. #435, 436).  That is,

summary judgment which had been entered in favor of DISC and the Judgment as a Matter of Law

entered in favor of Davis were set aside.  (*See* Docs. #435, 436).

**B.      Facts Relevant to the Pending Motions**

**1.      Transfers of Settlement Proceeds**

On November 21, 1998, International and DISC[14] entered into a Contract of Assignment

which assigned all rights, title, and interest in any legal action necessary to pursue resolution of the

---

[14]Roy Davis testified that DISC was created as a tax shelter.

Q:      As way of background, why is it that since you owned both companies [DISC and
        International] DISC had money to do these things and Strickland & Davis
        International did not have money to do these things?
A:      DISC is a tax shelter.

Q:      What does that mean?
A:      Domestic International Sales Corporation.

Q:      All right, would you explain that?
A:      If eighty percent of your business is exports, then you have a special tax
        consideration.

Q:      Are you indicating then that the use of DISC allowed you to legally pay less taxes
        than if you had used another entity?
A:      That's correct.

Q:      So with that in mind, did you run business through DISC for the purpose of
        minimizing tax that might have otherwise been used in one of the other companies?
A:      Some.

Q:      Well, have I correctly understood your point about DISC?
A:      Exports.

(Docs. # 462-468, Exh. M; Doc. #458, Exh. 5; Roy Davis Dep. at 17-18).

arbitration award regarding the Yemen deal to DISC.[15]  (Roy Davis Aff. at 2, ¶¶ 7-9).  As a result, the settlement funds were directly wire transferred by CitiBank into the DISC bank account at Citizens Bank of Russellville.[16]  (Roy Davis Aff. at 2, ¶¶ 8-9).  The stated rationale for this transfer was related to expenses previously paid by DISC on behalf of the debtor International, as well as an assignment of all rights.[17]  (*See* Roy Davis Aff. at ¶¶ 7-10 and Exh. 3 to Roy Davis Dep.; Doc. #472 at 1, ¶ 4).

After DISC received the money from the arbitration award, the company made several payments out of the proceeds, including monies disbursed to Roy Davis "as a shareholder distribution."  (Exh. 3 to Roy Davis Dep.) ("The remaining funds were disbursed to me as a shareholder distribution.").  Other payments included those made for office staff, utility/telephone,[18]

---

[15]Although Davis asserts this assignment occurred in November 1998, it was not revealed in court until 2004.  (*See* Roy Davis Aff. at ¶ 6; *see also* Exh. 3 to Roy Davis Dep.).  Interestingly, although the assignment was allegedly made in November 1998, when the first lawsuit was filed in December 2008 it was filed by International and not by DISC.  Of further concern is the fact that on July 2, 2005, Davis filed amended DISC tax returns for 2003 showing that DISC owned assets in the amount of $4,247,365.00 (the Yemen settlement) as of December 31, 2003.  Prior to the amendment, the settlement had been claimed by International on its tax papers.  (*See* Doc. #370, Submission 1) (1120S tax form of International).

[16]This fact is stated in the manner most favorable to the Davis Defendants, yet it is in dispute.  In the pretrial order of May 28, 2003, the parties agreed to the following summary statement: "On or about 10/10/01 Davis agreed to settle all claims for $16,325,000 with $5,768,750 wired to Mr. Saeed in Yemen, $4,222,500 wired to Phillip Geddes and the *balance wired to S&Davis*. $1,000,000 was wired to Samara by Davis."  (Doc. #103 at 3) (emphasis added).

[17]This is also a disputed fact, and is stated in the manner most favorable to the Davis Defendants.  Plaintiff Trustee claims that DISC received over a million dollars more than it was entitled to as a repayment of the alleged expenses, while Defendants maintain that the assignment was one of all rights, and not simply a "return of expenses."  (*See* Doc. #460 at 2, ¶ 4).

[18]Davis no longer has receipts to support his list of expenses paid by DISC.  (Roy Davis Dep. at 21-22).

repaying loans (including repaying members of Davis' family), insurance bond, CitiBank charges/loan, legal fees, travel, arbitration expenses, a deferred salary for Roy Davis, and payments to A.M. Samara and Jamil Thaher.  (*See* Roy Davis Aff. at 3-4, ¶ 10).  Specifically, DISC paid Davis' personal debts and made gifts to Davis' family; DISC also paid the bill to Family Pharmacy for Davis' personal medication.[19]  (Roy Davis Dep. at 60-61).  On October 19, 2001, Davis caused DISC to issue a separate check in the amount of $80,000 to each Davis child – David Davis, Cindy Taylor, and Susanne Terrel.  On January 10, 2002, DISC again issued a separate check in the amount of $80,000 to each Davis child.  Thus, the total amount given by Davis through DISC to each of his children was $160,000 for a total of $480,000.  (Roy Davis Dep. at 57-60).  Davis used the DISC account to make a $20,000 loan to his sister, Ernestine Colburn.[20]  (Roy Davis Dep. at 134).  These

---

[19]Q:  Now, I notice on this particular page above the first of the three checks in October 2001 there is a check to Family Pharmacy.  Do you see that check for ninety-one dollars and thirty-three cents?

A:  I'm looking.  Yes.

Q:  Now, was that for your personal medication?
A:  Yes.

(Roy Davis Dep. at 60-61).

[20]Q:  Now, I do see a check to Ernestine Colburn . . .

. . .

A:  It's a loan.

Q:  For twenty thousand dollars?
A:  It was a loan, yes.

Q:  And that was on January 10 of 2003.  Now, who is Ernestine Colburn?
A:  That's my oldest sister who's got very serious financial difficulties and I made her a loan.

expenditures of corporate funds for personal reasons was against the specific advice of Davis' trial counsel.[21]  (*See* Smith Dep. at 33-34).

The money from the arbitration award that DISC received was commingled with Davis' personal assets.  After Davis received a shareholder distribution from DISC, he "took a portion of those funds and placed them in a tax-free municipal bond with Franklin Templeton." (Exh. 3 to Roy Davis Dep.).  The Franklin Templeton Mutual Funds account was placed in Davis' own name, as well as his wife's name.  Later Davis invested an additional $1,750,000.00 from his personal account into the Franklin Templeton Fund.  (Roy Davis Dep. at 75-77).  The dividends were paid by direct deposit into the personal bank accounts of Davis and his wife.  (Roy Davis Dep. at 80).  The direct deposit interest income of the Franklin Templeton account to Voncile Davis' personal bank account lasted from December 2002 to October 2003 and totaled $100,280.48.  (*See* Doc. #460 at 4, ¶ 13; *see also* Doc. #474 at 4).

---

Q:     And did she ever pay that back?
A:     Paid part of it back.

Q:     How much did she pay back?
A:     Four thousand dollars.

(Roy Davis Dep. at 134-135).

[21]Davis' attorney testified:

Q:     So now later in your comments to the Court you said, "I will give assurances to Mr. Allenstein and the Court that the monies have been are where they are."  Now, this is part of what you were discussing that was a misunderstanding based on what you heard Mr. Davis to say in an earlier hearing?
A:     Yes, sir.  Also my recommendations to him that he did not need to do anything to commingle funds given the fact that he was in litigation with Mr. Samara going back to 2002 up until the time of this hearing.

(Richard Smith Dep. at 33).

16

Voncile Davis also received three checks directly from DISC – $200,000 on October 15, 2001, $50,000 on January 23, 2003, and $100,000 on October 10, 2003, for a total of $350,000. (*See* Doc. #460 at 4, ¶ 14; *see also* Doc. #474 at 4). Voncile Davis directly benefitted when Davis used $150,000 of the money distributed to him by DISC to buy a house and 37 acres known as "the home place." The property is titled in the names of Davis and his wife. (*See* Doc. #460 at 4, ¶ 15; *see also* Doc. #474 at 4).

The Davis Defendants do not dispute that any of these transfers of funds were made. (*See generally* Docs. #459-2, 474).

### 2.    Davis Seeks the Advice of Counsel in Creating New Businesses

In early 2002, Davis contacted Christian & Small seeking legal advice with respect to International and DISC.[22] (Smith Aff. at 2). During the meeting, Davis expressed a desire to form another business entity, Native American Development, LLC ("NAD") for the purpose of conducting business with Native American tribes in the southwestern United States. (Smith Aff. at 3). The matter of creating NAD was referred to Ahrian Tyler, a partner at Christian & Small. (Smith Aff. at 3; Tyler Aff. at 2). Knowing that Davis had expressed a desire to keep NAD separate from DISC and International, Richard Smith and Ahrian Dudley cautioned Davis on several occasions not to fund NAD with any funds which might be considered part of the Yemen settlement proceeds, and Davis assured them he would not. (Smith Aff. at 10; Dudley Aff. at 3-4). On April 27, 2004, the documents creating NAD were filed for record,[23] with certain relatives of Davis listed as "members" of the LLC. Transfers of funds to NAD were made in three forms – one transfer from Davis, a

---

[22]This is a disputed fact and is stated in the manner most favorable to the Davis Defendants.

[23]This creation date of NAD was *after* the verdict against International on June 21, 2004.

transfer by DISC to Davis to pay his taxes (which resulted in a tax refund that he transferred to

NAD), and a transfer from an ING account.  (Roy Davis Dep. at 68-70, 77-85, 93-95, 114-116).

      Christian & Small's fees and expenses were paid by DISC, Davis, and NAD.  The law firm

received the first payment from DISC in April 2002 and continued to receive payments from DISC

through March 2004, totaling $184,867.40.  Davis provided two payments to the law firm in May

2004, for a total of $24,608.73, and NAD made payments thereafter through February 2005 for a

total of $118,074.79.[24]  (*See* Doc. #460 at 4-5, ¶ 19).  There was never a contention that the fees paid

to the law firm during its defense of the case were fraudulent transfers until February 20, 2009.  (*See*

Doc. #414).

## V.  <u>ANALYSIS</u>

      There are three pending motions for summary judgment in this case – one filed by the law

firm of Christian & Small (Doc. #457), one filed by the Davis Defendants (Doc. #459),[25] and one

filed by the Trustee (Doc. #460).  All of those motions deal with the presence or absence of allegedly

fraudulent transfers, and all deal with the potential applicability of the Alabama's fraudulent

---

[24]On September 26, 2007, the court granted leave for the law firm to withdraw as attorneys
for the Davis Defendants.  (*See* Doc. #365).

[25]The motion for summary judgment filed by the Davis Defendants presents a statute of
limitations argument, citing Alabama Code Section 8-9A-9(3) for the proposition that claims under
the Alabama Fraudulent Transfer Act must be brought within four years.  (*See* Doc. #459-2 at 15).
However, the Trustee was substituted as a Plaintiff in this case, and filed a Sixth Amended
Complaint on February 20, 2009.  Pursuant to Rule 15(c) of the Federal Rules of Civil Procedure,
Plaintiff Trustee's Sixth Amended Complaint relates back to the date of the originally filed
complaint on March 19, 2002.  Therefore, the statute of limitations does not bar this action.
    The Davis Defendants' motion for summary judgment also briefly mentions the issue of
judicial estoppel as a possible bar to the Trustee's claims citing *Parker v. Wendy's Intern., Inc.*, 365
F.3d 1268 (11th Cir. 2004) in purported support thereof.  (*See* Doc. #459-2 at 18).  But the concept
of judicial estoppel does not apply to a bankruptcy trustee and, further, and in any event, excess relief
gained by the creditor would default back to Davis.  *See Parker*, 365 F.3d at 1273, n.4.

conveyance statute ("AUFTA").  (*See* Doc. #459-2 at 12) ("So, it appears that the primary issue

herein involves alleged fraudulent transfers."); (Doc.#460 at 9, 10-29) ("The following discussion

will demonstrate that Davis, the entities he controlled and his family members were all insiders who

did not act in good faith and did not take for value.").  Specifically, the Trustee seeks to avoid

transfers under 11 U.S.C. § 544(b), stating in applicable part: "the trustee may avoid any transfer of

an interest of the debtor in property or any obligation incurred by the debtor that is voidable under

applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this

title. . . ." 11 U.S.C. § 544(b)(2); *see also* Doc. #461 at 6.  The term "applicable law" includes state

fraudulent conveyance statutes, and in Alabama that statute is the Alabama fraudulent conveyance

statute, Ala. Code 1975 § 8-9 A-4.[26]  The transfers at issue here were first made from S&Davis

International to DISC; subsequently, transfers were made from DISC to Davis himself, members of

the Davis family,  Native American Development, LLC, and Christian & Small, LLP.

## A.    Fraudulent Transfer Law in Alabama

The Alabama Supreme Court views transactions to defeat creditors "with disfavor" and gives

AUFTA "a liberal construction."  *Taylor v. Peoples Fertilizer Co.*, 270 Ala. 243, 254 (1959).

Alabama courts have also consistently held that where a conveyance is made to a family member,

the grantor's intent warrants especially careful scrutiny. *See McPherson Oil Co., Inc. v. Massey*, 643

So.2d 595 (Ala. 1994); *Pennington v. Bigham*, 512 So.2d 1344 (Ala. 1987).  However, every

---

[26]The Samara Plaintiffs essentially join in the same argument "because the submissions including the record, prior pleadings, and the submissions submitted with this response show that Roy Davis, through his corporations and NAD, LLC fraudulently transferred the settlement funds which belonged to Strickland & Davis International, Inc. to Roy Davis, the DISC Corporation, NAD, LLC, Roy Davis' family and Christian & Small in violation of an order of the Court."  (Doc. #475 at 1).

19

conveyance that frustrates a creditor is not necessarily a fraudulent conveyance.  *See Aucoin v. Aucoin*, 727 So.2d 824, 827 (Ala. Civ. App. 1998).

The AUFTA recognizes two different types of fraudulent transfers: actual fraud and constructive fraud.  Thus, as an initial matter, § 8-9A-4(a) allows a creditor to recover a transfer where the creditor proves actual fraud:

> A transfer made by a debtor is fraudulent as to the creditor, whether the creditor's claim arose before or after the transfer was made, if the debtor made the transfer with actual intent to hinder, delay, or defraud any creditor of the debtor.  Ala. Code § 8-9A-4 (a).

To determine whether actual intent to defraud existed, a court may consider the following factors: (1) whether the transfer was to an insider; (2) whether the debtor retained possession or control of the property transferred after the transfer; (3) whether the transfer was disclosed or concealed; (4) whether before the transfer had been made the debtor had been sued or threatened with suit; (5) whether the transfer was of substantially all of the debtor's assets; (6) whether the debtor absconded; (7) whether the debtor removed or concealed assets; (8) whether the value of consideration received by the debtor was reasonably equivalent to the value of the asset transferred; (9) whether the debtor was insolvent or became insolvent shortly after the transfer was made; (10) whether the transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) whether the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.  *See* § 8-9A-4 (b).

The statute also allows a creditor to recover a transfer where the creditor proves constructive fraud.

> A transfer made by a debtor is fraudulent as to a creditor, where the creditor's claim arose before or after the transfer was made, if the debtor made the

20

transfer without receiving a reasonably equivalent value in exchange for the transfer and the debtor:

   (1)   Was engaged or was about to engage in a business or transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

   (2)   Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

Ala. Code § 8-9A-4(c).

## B.     The Parties' Respective Positions

The Trustee argues that the transfers are due to be set aside under both aspects of the fraudulent transfer statute.  (*See* Doc. #461 at 7-8) (noting that Judge Putnam ruled that "the voluntary donation of the proceeds to DISC corporation constituted a fraudulent conveyance as to S & Davis's creditors, regardless of whether there was any intent to defraud or even whether DISC corporation was on notice of S & Davis's debt to plaintiff.").  The Davis Defendants, on the other hand, assert that no actual fraud could have occurred because there was a valid assignment from International to DISC, thus there was no "actual intent to hinder, delay, or defraud any creditor of the debtor."[27] (Doc. #459-2 at 15-16).  The Davis Defendants' primary argument is that International was never in possession of any of the settlement proceeds from the Yemen wheat settlement and that

---

[27]The court is aware that Roy Davis has submitted an affidavit to this court which asserts that the assignment "was not intended to hinder, delay, or defraud any creditors."  (Davis Aff. at ¶ 23).  However, that statement is not sufficient to create a disputed material fact for purposes of summary judgment.  Mere conclusions and unsupported factual allegations are insufficient to defeat a summary judgment motion.  *See Ellis v. England*, 432 F.3d 1321, 1325 (11th Cir. 2004) (citing *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989).

International had no assets prior to the commencement of this litigation.[28]  (*See* Doc. #189 at 3-5).

The Davis Defendants do not appear to make an argument against constructive fraud in their brief

in support of summary judgment (*see generally* Doc. #459-2), nor do they do so in their opposition

to the Trustee's motion for summary judgment (*see generally* Doc. #474), other than to argue that

the Trustee's claims are barred by res judicata, law of the case, and the statute of limitations.  (*See*

Doc. #459-2 at 12-20).  Christian & Small argues that the transfers were not made with any actual

intent to defraud because "the evidence does not support any contention that the International-to-

DISC assignment, or the distribution made of the Yemen proceeds, demonstrated any actual intent

to hinder, delay, or defraud any creditors" and that constructive fraud cannot lie against the Firm

because the Firm received payments in reasonably equivalent value to the costs of its services.  (Doc.

#458 at 17).

### C.       The Initial Transfer from International to DISC

Plaintiff Trustee argues that the transfer from International to DISC was fraudulent for

several reasons: (1) DISC received from International over a million dollars more than its claim

against International; (2) Davis controlled both International and DISC; (3) the testimony does not

support some of the expense claims by DISC; and (4) certain expense claims by DISC are

undocumented.  (Doc. #460 at 10-15).  The Davis Defendants counter that International entered into

a legal Contract of Assignment with DISC on November 21, 1998 which assigned all rights, title,

and interest in any legal action necessary to pursue resolution of the arbitration award to DISC.

---

[28]It is true that at one point, the allegation that the transfer from International to DISC was
fraudulent had been dismissed by summary judgment (Docs. #93, 94).  (*See* Doc. #458 at 4-5).
However, at least by the summer of 2004, Judges Propst and Putnam were putting the issue of
fraudulent transfer back into play by attempting to impose a constructive trust on Davis,
International, and DISC.  (*See* Docs. #174, 187).

(*See* Doc. #474 at 5). "Given that the November 21, 1998 Contract of Assignment is valid, and given that absolutely no evidence has been presented refuting the legal effectiveness of said November 21, 1998 Contract of Assignment, all allegations of subsequent fraudulent conveyances are unsupportable, and due to be dismissed by way of summary judgment." (Doc. #474 at 5-6).

Indeed, the question of whether the Contract of Assignment is valid is one that is disputed by the parties. (*See* Doc. #473 at 2, ¶ 4) ("The Trustee has serious doubts as to the authenticity of the alleged assignment."). Exhibit C of the Davis Defendants' evidentiary submission contains a Contract of Assignment dated November 21, 1998 and signed by Roy Davis. The contract provides:

> For value received the undersigned S & Davis International, Inc. does hereby set over and assign unto S & Davis International Disc., Inc. of Russellville, Alabama all of its rights, title, and interest in arbitration award, Yemen Wheat Contract Arbitration, and or any future projects or sales contract(s) it may become involved into.
>
> The S & Davis International, Inc. further grants to S & Davis International Disc., Inc. of Russellville, Alabama, full power to collect, sue for, and in any other manner enforce collection of any debts that may be owed to S & Davis International, Inc., in all such manner and means as permitted by law.

There is nothing else in the record to establish the authenticity of the purported Contract, other than the statement by the Davis Defendants that the settlement proceeds were wire transferred into the Disc corporation account on October 15, 2001 "which was a valid and lawful transfer."[29] (Doc. #459-2 at 15). "The day that the settlement proceeds were wired into the Disc account, that being

_____

[29]In his affidavit of July 14, 2004, Roy Davis attests that: "Given the uncertainty of collection on the claim against the Republic of Yemen, the additional costs of collection, and the financial inability of International, Inc. to fund and to pursue the legal actions against the Republic of Yemen, a contract of assignment was entered into between International, Inc. and the Disc Corporation whereby International, Inc. assigned all of its rights, title and interest in any legal action necessary to pursue resolution of the arbitration award." (Doc. #189 at 1).

October 15, 2001, defendant that very day wired out multi million dollar payments to all of the concerned parties . . ." (Doc. #459-2 at 16).

Plaintiff Trustee calls the assignment into question by noting that the Davis Defendants never mentioned the assignment or raised the issue until *after* the jury verdict and judgment were entered. (*See* Doc. #473 at 2, ¶ 4).  On July 2, 2004, a little more than two months after the jury verdict in favor of Samara, Davis filed *amended* DISC tax returns for 2001, 2002, and 2003, claiming that settlement proceeds belonged to DISC and *not* to International as previously claimed.[30]  (*See* Doc. #370, Submissions 1, 2).  And when the parties had a pre-trial conference on May 23, 2003, they stipulated that the settlement funds were wired to International.[31]  (Doc. #103 at 3).  At the time the lawsuit was filed to enforce the arbitration award, the alleged assignment would have already taken place; nevertheless, despite that asserted fact, the lawsuit was filed by International, not DISC.  (*See* Doc. #110 at 6(a)(10)).  These "facts" indeed are puzzling.

But resolving the disputed factual issue of whether or not the Contract of Assignment is valid is not an appropriate undertaking for this court on summary judgment.  Instead, the court can assume,

---

[30]The settlement funds had previously been claimed by International on its 2001 tax return filed on December 2, 2002.  (*See* Doc. #370, attachment no. 1).

[31]It is axiomatic that parties are bound by their stipulations.  ("When an adverse party is willing to stipulate to the truth of a certain allegation, the party having the burden of proving that allegation is relieved from proving it, that is, a stipulation renders proof unnecessary and both prevents an independent examination by a judicial officer or body with respect to the matters stipulated and binds the parties on appeal.  It has been said that such stipulations take the place of evidence with regard thereto, and are favored and encouraged by the courts.").  73 AM. JUR. 2d STIPULATIONS § 17 (2010).  This court has only "redone" this case from the date of the jury verdict forward.  (*See* Doc. #435, 436).  Therefore, the stipulation at issue, for all intents and purposes, *remains in effect in this case*.  This is enough for the court to disregard the Davis Defendants' claim that the money was "rightfully" that of DISC.  However, in the interest of thoroughness, the court considers, in the alternative, the Davis Defendants' argument otherwise.

24

without deciding, only for purposes of summary judgment, that there actually did exist a Contract of Assignment between International and DISC.  The money from the Yemen wheat settlement may nonetheless have been fraudulently conveyed to DISC if it was done with intent to hinder, delay, or defraud any creditor, as it is of no import "whether the creditor's claims arose before or after the transfer was made." Ala. Code § 8-9A-4(a).  Similarly, the money from the Yemen wheat settlement may constitute constructive fraud if it was received by DISC without International "receiving a reasonably equivalent value in exchange for the transfer," as again it is of no import "whether the creditor's claim arose before or after the transfer was made."  Ala. Code § 8-9A-4(c).  *See also Parsons & Whittemore Enterprises Corp. v. Cello Energy, LLC*, 2010 WL 338995, No. 09-631-CG-B at *12 (S.D. Ala. Aug. 24, 2010) (finding fraudulent transfer possible even in face of Services Agreement).

The Davis Defendants have done little to refute the facts set forth by the Trustee which undisputedly point to the conclusion that the transfer to DISC was fraudulent.  While he maintains that the assignment of rights to the Yemen settlement was done to repay debts owed by International to DISC, Davis admits that there was a substantial sum left after all of the expenses[32] allegedly incurred by DISC were paid:

> Q:      . . . But what I understand you to be telling me is that Disc got repaid the expenses that you alleged that it was owed and it got a million dollars on top of that because of the assignment of the contract; is that correct?
> A:      The Disc, yes.

---

[32]There is no dispute that DISC did in fact use part of the settlement proceeds to pay creditors, including banks, attorneys, and Samara himself.  (*See* Doc. #189) (outlining payments made by DISC Corporation).  Of the more than $10 million received by DISC by way of wire transfer, over $5 million went to the attorney who secured the funds and Samara, and a significant sum went to repay office fees and bank fees.  (*See* Doc. #189 at 3-4).  But the interesting part is where the remainder of the money went.

25

Q:     And when you say a million plus, can you be a little more specific?  To some
       people that could be a million and ten dollars and to some people that could
       be one million nine hundred and ninety thousand and ten dollars.  So let's try
       to define that.

A:     Well, the best of my recollection of bank loans and the expenses, it was about
       a million twenty, twenty-five thousand.

(Davis Dep. at 24-25).[33]   DISC used the extra money received to pay Davis a shareholder

distribution.  (Exh. 3 to Davis Dep.).  And Davis readily admits that he controlled both corporations.

Q:     Now you are familiar with the entity known as Strickland & Davis
       International, Inc.?

A:     I am.

Q:     And would you explain to the Court how you're familiar with that entity?

A:     I'm the officer.  I'm the chairman of the board of that company.

. . .

Q:     And this other corporation, can we call it Disc corporation for short?

A:     Yeah, Disc.

Q:     Okay.  Now, who owns Disc?

A:     I do.

Q:     And who are the officers of Disc?

A:     I am.

(Davis Dep. at 8-12).  Davis also admitted that DISC was not a separate, functioning company but

rather a tax shelter for his other businesses:

Q:     As a way of background, why is it that since you owned both companies Disc
       had money to do these things and Strickland & Davis International did not
       have money to do these things?

A:     Disc is a tax shelter.

---

[33]And Davis has produced no bills, receipts, or other documentation to support the assertion
that International owed DISC any money at all.  (*See* Davis Dep. at 21-22) (testifying that the
detailed list of expenses was lost or misplaced.  "The Court has them, somebody.  Someone has
them, I don't.  The Court asked me through my counsel to prepare from what records I have a list
and that's how this came about.").

Q:    What does that mean?

A:    Domestic International Sales Corporation.

Q:    All right, would you explain that?

A:    If eighty percent of your business is exports, then you have a special tax consideration.

Q:    Are you indicating then that the use of Disc allowed you to legally pay less taxes than if you had used another entity?

A:    That's correct.

Q:    So with that in mind, did you run business through Disc for the purpose of minimizing tax that might have otherwise been used in one of the other companies?

A:    Some.

Q:    Well, have I correctly understood your point about Disc?

A:    Exports.

Q:    Now, would the Yemen contract have been considered an export?

A:    Yes.

Q:    So that would have been one of those businesses that Disc could save you money on taxes?

A:    Could be, yes.

(Davis Dep. at 17-18).

This testimony evidences that the transfer carries "badges of fraud" necessitating a finding

of actual intent to hinder, delay, or defraud creditors.[34] *See Parsons & Whittemore Enterprises Corp.*

---

[34]Although not fleshed out by any of the parties, the facts in this case also lend themselves to a finding of constructive fraud.  As outlined above, International made the transfer to DISC without receiving a reasonably equivalent value in exchange for the transfer.  (*See* Roy Davis Aff. at ¶¶ 7-10 and Exh. 3 to Roy Davis Dep.; Doc. #460 at 2, ¶ 4; Doc. #472 at 1, ¶ 4).  Further, International reasonably should have believed that it would incur debts beyond the ability to pay as they came due.  § 8-9A-4(c).  Although Davis testified that he first became aware that Samara was going to sue International for additional money above the one million dollars already sent to Samara in March 2002 (well after the 1998 Contract of Assignment) (*see* Roy Davis Dep. at 174), the chronology of undisputed facts in this case point to a finding that Davis reasonably should have believed that International would face another lawsuit from Samara.  The first lawsuit was filed by International against the Country of Yemen in December 1998, with a judgment entered against the

*v. Cello Energy, LLC*, 2010 WL 338995, No. 09-631-CG-B at *19 (S.D. Ala. Aug. 24, 2010) ("While a single badge of fraud may only create a suspicious circumstance and may not constitute the requisite fraud to set aside a conveyance, several of them when considered together may afford a basis to infer fraud."). By Roy Davis' own testimony: the transfer was to an insider (*see* Davis Dep. at 8-12, 16-18); Davis retained actual control of the property transferred after the transfer and used those funds to pay his personal obligations and family members (*see* Exh. 3 to Davis Dep.; Roy Davis Aff. at 3-4, ¶ 10; Davis Dep. at 57-61, 134-135); the transfer was concealed in that it was not brought to the attention of *any* of the parties involved *or* the court until *after* a jury verdict had been reached in favor of Samara (*see* Doc. #473 at 2, ¶ 4; Doc. #103 at 3; Doc. #110 at 6(a)(10); Doc. #370, attachments nos. 1, 2); the transfer was of substantially all of the debtor's assets (as evidenced by International being in bankruptcy court today); and the value of consideration received by the debtor was not reasonably equivalent to the value of the asset transferred (*see* Exh. 3 to Roy Davis Dep.; Roy Davis Aff. at 3-4, ¶ 10; Roy Davis Dep. at 21-22). Thus, the transfer from International to DISC was fraudulent. *See L.W.&P. Armstrong v. Miller*, 189 So. 74 (1939) (the transfer of notes and mortgages from a debtor to his wife was fraudulent toward the debtor's creditors and was set aside where the evidence indicated that the debtor reserved the beneficial use of the property, possessed the documents, collected interest on a portion of the notes if not all of them, and received rents on the property); *Mitchell v. Conway*, 60 So.2d 676 (Ala. 1952) (mortgage of goods given by

---

Republic of Yemen on September 13, 2001. (*See generally* case no. CV-98-J-3141-NW). But in November 2001, International settled with Yemen for a total payment of $16,325,000.00, paying Samara $1,000,000 of that sum, but refusing to pay any more. (*See generally* Doc. #2). International engaged in this behavior despite having entered into a joint venture agreement with Samara, binding the two companies to do business in the Republic of Yemen for their mutual benefit. That joint venture agreement was entered into on April 21, 1996 and its existence was a factual issue *resolved* by the jury verdict in this case. (*See generally* Docs. #1, 145, 146).

owner as security for debt, where owner is permitted to remain in possession and carry on business for his own benefit, is made in trust for owner's own use and therefore fraudulent and void as to existing and subsequent creditors); *Taylor v. Peoples Fertilizer Co.*, 117 So.2d 180 (Ala. 1959) (any transfer of real property which is merely a simulated assignment or conveyance behind which a debtor may hide to enjoy the use of property is void); *Varner v. Varner*, 662 So.2d 273 (Ala. Civ. App. 1994) (where husband transferred $20,000, the customer list, and the accounts receivable from a corporation owned by his mother and his stepfather, record evidence supported a conclusion that the husband's clear intent in these transactions was to avoid making his court-ordered obligations and to limit his potential liability to the wife in the divorce settlement).

For the foregoing reasons, the Trustee's motion for summary judgment (Doc. #460) – as it relates to the transfer from International to DISC – is due to be granted and the Davis Defendants' motion for summary judgment (Doc. #459) on this claim is due to be denied.

### D. The Transfers from DISC to Davis, Members of the Davis Family, and Native American Development, LLC

Because the initial transfer from International to DISC is due to be voided, the subsequent transfers from DISC are also subject to the Trustee's avoidance power under the Alabama Code. Of all of the sections of the AUFTA which may form a predicate for liability, only transfers arising under § 8-9A-4(a) allow a transferee to totally escape application of the AUFTA when the transferee is shown to have received the subject property in "good faith." In this regard, § 8-9A-8(a) provides that transfers only under § 8-9A-8(a) are "not voidable . . . against a person who took in good faith and for a reasonably equivalent value or against any subsequent transferee or obligee who took in good faith." *See also* 9B AM. JUR. 2d BANKRUPTCY § 2058 (July 2010) ("Where liability is asserted

against an immediate or mediate transferee, the trustee may not recover from a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer involved; or any immediate or mediate good-faith transferee of such transferee."). Thus, the elements of the "good faith" defense under the section of the Bankruptcy Code governing the liability of a transferee of an avoided transfer are: (1) good faith, (2) for value, and (3) without knowledge of the voidability of the transfer. *See* 9B AM. JUR. 2d BANKRUPTCY § 2058. The burden of showing value, good faith, and lack of knowledge is on the transferee.[35] *See In re American Way Serv. Corp.*, 229 B.R. 496, 525-526 (S.D. Fla. 1999) (internal citations omitted).

A transferee acts in good faith if it had no facts before it that would cause a reasonable person to investigate whether the transfer would be avoidable. The good faith of the recipient of an alleged fraudulent transfer, of the kind required to support a "good-faith-for-value" defense, must be established using an objective standard and is primarily a question of fact; the question is whether circumstances would place a reasonable person on inquiry of the debtor's fraudulent purpose, and whether diligent inquiry would have discovered that purpose. *See* 9B AM. JUR. 2d BANKRUPTCY § 2058. Good faith may be lacking because of a transferee's knowledge of a transferor's unfavorable financial condition at the time of the transfer or because of a transferee's position as an insider with control over the corporation's finances. *See In re Greenbrook Carpet Co., Inc.*, 22 B.R. 86, 91 (Ga. 1982) (internal citations omitted). A creditor can not close his eyes so as to remain ignorant of the

---

[35]Neither the Davis Defendants nor the Trustee have done the court the good favor of explaining who bears the burden of proof with respect to the good faith defense. Nevertheless, the court's own research has led it to this conclusion and, in any event, the evidence is undisputed and overwhelming such that assignment of the burden of proof is not dispositive of this issue.

debtor's financial condition. *Id.* at 91 (citing *In re Hygrade Envelope Corp.*, 366 F.2d 584 (2d. Cir. 1966)).

A mediate transferee may retain the funds transferred if it can prove that the transfer was made for value. The "value" required to be paid by the transferee is merely consideration sufficient to support a simple contract; there is no requirement that the value given by the transferee be a reasonable or fair equivalent. "Value" includes satisfaction or securing of a present antecedent debt. The value requirement does not mean that the initial transferee must have given value to the debtor before a subsequent transferee is protected; value to the transferor is sufficient to satisfy the requirement. This exception therefore applies regardless of whether the initial transferee gave any value to the debtor. *See* 9B Am. Jur. 2d Bankruptcy § 2058.

In applying the "good-faith" defense set forth in the section of the Bankruptcy Code governing the liability of a transferee of an avoided transfer, courts construe the "knowledge" of a transferee by examining what the transferee objectively knew or should have known, rather than examining what the transferee actually knew from a subjective standpoint. *See* 9B Am. Jur. 2d Bankruptcy § 2058.

### 1.     The Transfers by DISC to Roy Davis

Plaintiff Trustee identifies several points of evidence from the record to establish that Davis received monies from the arbitration award fraudulently and in fact controlled the transfers of money from DISC to subsequent transferees: DISC paid Davis' personal tax liability resulting from receipts of funds distributed to him by DISC from the arbitration award (Roy Davis Dep. at 34); DISC paid Davis $200,000 in satisfaction of a personal loan on October 15, 2001 (Roy Davis Dep. at 46-47, 56); DISC paid the bill to Family Pharmacy for Davis' personal medication (Roy Davis Dep. at 60-

61); Davis used the DISC account to make a $20,000 loan to his sister Ernestine Colburn (Roy Davis Dep. at 60-61, 134); and DISC paid Davis' legal fees and a judgment resulting from a "small personal loan" made to Davis by a Dr. Patel (Roy Davis Dep. at 61-64). The Trustee has presented additional undisputed evidence that Davis commingled the corporate assets of DISC with his own personal funds – for example, Davis testified that he invested $1,000,000.00 of settlement funds from the DISC corporation in a Templeton Franklin Fund, and later invested $1,750,000.00 of his own money in the same entity. (Roy Davis Dep. at 75-77). The dividends were paid by direct deposit into the personal bank account of Davis and his wife. (Roy Davis Dep. at 75-77). The co-mingling continued when Davis cashed in the Franklin Templeton fund shares and withdrew money from the account. Davis cannot account for $2,000,000.00 of that money, stating only that some went to DISC corporation, and some went to "other places." (Davis Dep. at 82-83). Davis did recall, however, that he placed around $700,000 of the funds from Franklin Templeton in an ING annuity in his and his wife's names, which "would have been either for corporate use or made personal use." (Roy Davis Dep. at 143). The testimony is concerning in light of the fact that during the preliminary hearing held by Judge Propst on April 1, 2002, Davis testified under oath that the arbitration award money was being held by DISC and that the money remained in DISC's name – "It's in the corporation's name, Judge. It's not in my name." (Preliminary Hearing Transcript at 49). Davis further assured the court that "the money has been distributed from S& Davis to S & Davis International DISC corporation" and that Davis had control over DISC "as a corporation." (Preliminary Hearing Transcript at 50-52).

Davis makes no attempt to refute these facts.[36]  (*See* Doc. #474 at 7) (stating only: "Plaintiff has wholly failed to establish that transfers of assets were made with any intent to hinder, delay, or defraud any creditor;" and "Plaintiff has also wholly failed to prove the source of all of the payments at issue herein was from 'settlement proceeds.'").   Therefore, his first-hand knowledge of International's insolvency and awareness of DISC's dependent relationship to International renders Davis' receipt of payments from DISC subject to avoidance by the Trustee because Davis was not a good faith transferee of the payments received by DISC.  A subsequent transferee who was a party to the fraud does not take in good faith.  ALA. CODE § 8-9A-8, Comment 1. The Trustee's motion for summary judgment (Doc. #460) as it relates to this claim is due to be granted and the Davis Defendants' motion for summary judgment (Doc. #459) as to the same claim is due to be denied.

### 2.    The Transfer by DISC to Voncile Davis

The Trustee asserts that Roy Davis' wife, Voncile Davis, is liable as a subsequent transferee for receipt of arbitration award funds not in good faith.  (*See* Doc. #461 at 23).  Voncile Davis fails to even argue in support of a good faith defense; instead, she merely asserts that the original transfer from International to DISC was not fraudulent.  (*See generally* Doc. #474).  In light of this glaring omission, the evidence speaks for itself, and Mrs. Davis is liable as a subsequent transferee.  *See In re American Way Serv. Corp.*, 229 B.R. 496, 525-526 (S.D. Fla. 1999) (internal citations omitted) (the burden of showing value, good faith, and lack of knowledge is on the transferee).

Mrs. Davis purportedly received arbitration award funds from three separate sources – direct deposit from the Franklin Templeton account, checks directly from DISC, and money spent by Mr.

---

[36]It is not surprising that Roy Davis does not attempt to set out the defense of "good faith" as a subsequent transferee of the funds since he was a party to the fraud.

Davis for the mutual benefit of Mr. and Mrs. Davis.  The direct deposits from the Franklin Templeton account lasted from December 2002 to October 2003 and totaled $100,280.48.  (Docs. #462-468, Exh. E).  Of the three checks Mrs. Davis received from DISC – $200,000 on October 15, 2001, $50,000 on January 23, 2003, and $100,000 on October 10, 2003 – she was unable to recall why she received any of them. (Docs. #462-468, Exhs.).  A subtotal of $150,000.00 of the money distributed to Davis by DISC was used to buy a house and 37 acres, titled in the names of Mr. and Mrs. Davis.  (*See* Roy Davis Dep. at 146-147).

The Trustee's motion for summary judgment (Doc. #460) as it relates to this claim is due to be granted and the Davis Defendants' motion for summary judgment (Doc. #459) as to the same claim is due to be denied.

### 3.   The Transfer by DISC to Davis' Adult Children

The Trustee argues that Davis' three adult children are liable as subsequent transferees of the arbitration funds from the Yemen settlement.  (*See* Doc. #461 at 24).  Roy Davis testified that he caused DISC to issue checks to his children on two separate occasions.  (*See* Roy Davis Dep. at 57-60).  On October 19, 2001, DISC issued a separate check in the amount of $80,000 to each Davis child – David Davis, Cindy Taylor, and Susanne Terrel.  (Roy Davis Dep. at 57-60).  On January 10, 2002, DISC again issued $80,000 in separate checks to each of Roy Davis' children.  (Roy Davis Dep. at 57-60).  Although two of the children testified that they had loaned their father small amounts of money ($45,000 and $6,000), neither claimed that they had ever made any loan to DISC. (David Davis Dep. at 11-12; Cindy Taylor Dep. at 12).  The money from DISC was a gift, not a repayment of any loan or obligation.  (*See* David Davis Dep. at 17; Cindy Taylor Dep. at 22-24; Susanne Terrel Dep. at 11-12).

David Davis, Cindy Taylor, and Susanne Terrel make no argument to the court that they took the money in good faith. In fact, their opposition to the Trustee's motion for summary judgment makes no specific mention of the money gifted to them at all. (*See generally* Doc. #474). Nor does their brief in support of their own motion for summary judgment. (*See* Doc. #459-2 at 12-20). Therefore, the Trustee's motion for summary judgment (Doc. #460) as it relates to this claim is due to be granted and the Davis Defendants' motion for summary judgment (Doc. #459) as to the same claim is due to be denied.

### 4.   The Transfers to Native American Development, LLC

The Trustee claims that DISC transferred money to Native American Development, LLC ("NAD") and that NAD is therefore liable as a subsequent transferee of funds from the Yemen arbitration award. The Davis Defendants counter only that NAD was established for lawful business purposes "well in advance of any judgment being entered against S&Davis International, Inc." (Doc. #474 at 7; *see also* Doc. #459-2 at 17).

Roy Davis began talking to attorneys at Christian & Small about the development of Native American Development, LLC in January 2002 to take the place of DISC, to develop a project to produce table eggs for two of the Navaho chapters, and to negotiate a project in Amman, Jordan. (Davis Dep. at 85-90, 176; Dudley Aff. at 2). Davis' attorneys cautioned him that in order to keep NAD separate from Davis' other corporations, Davis should not use any funds which might be considered part of the settlement proceeds from the Yemen wheat settlement. (Dudley Aff. at 3). Despite that advice, the Rule 56 evidence is undisputed that Davis used arbitration award money to fund NAD.

For its funding, NAD received payments in three forms – one transfer from Davis, a transfer by DISC to Davis to pay taxes, which resulted in a tax refund that was transferred to NAD, and a transfer from the ING account. (*See* Roy Davis Dep. at 68-70, 77-85, 93-95, 114-116). The personal loan was made in May 2004 of $100,000. (Roy Davis Dep. at 92-93, 101-102). The tax refund was in the amount of $401,708.41.[37] (Roy Davis Dep. at 93-95). The transfer from the ING account was in the amount of $470,822.14. Davis had previously placed his distributions from DISC in a Franklin Templeton account and then moved a large portion of the fund to the ING account. (Roy Davis Dep. at 68-70, 77-85, 176). The total of payments received by NAD was $972,530.55.

These facts evidence that NAD was not a good faith transferee of the payments received by DISC. To the contrary, Davis controlled International, DISC, and NAD, and a subsequent transferee who was a party to the fraud does not take in good faith. ALA. CODE § 8-9A-8, Comment 1. The Trustee's motion for summary judgment (Doc. #460) as it relates to this claim is due to be granted and the Davis Defendants' motion for summary judgment (Doc. #459) as to the same claim is due to be denied.

## E.   Christian & Small, LLP's Potential Liability as a Subsequent Transferee and for Civil Contempt

The Sixth Amended Complaint added, for the first time, the law firm of Christian & Small, LLP (referred to at times herein as the "Firm") as a defendant. (Docs. #414, 443). Specifically, Counts Twenty and Twenty-One are brought against the Firm – for money paid in violation of court rules, and for contempt of court order. As grounds therefor, the Trustee contends that the court had

---

[37]When Davis received a tax refund in the amount of $401,708.41 on distributions received from DISC in 2004, he deposited that refund in the NAD bank account. (Roy Davis Dep. at 93-95). There is no doubt that the tax refund came as a result of the DISC distributions because Davis had no other source of income between 2000 and 2004. (Roy Davis Dep. at 93-95).

imposed a constructive trust on certain settlement proceeds, yet the Firm accepted payments with the use of monies which were subject to the constructive trust. (*See* Doc. #414 at ¶¶ 134-140; Doc. #434 at ¶¶ 141-152). In addition, the Trustee claims that the Firm made representations to the court about the status and whereabouts of settlement funds that were deceitfully or recklessly made without adequate request for documentation from the client. (*See* Doc. #434 at ¶¶ 141-152). Now the Trustee seeks summary judgment against the Firm as to those claims.[38] (*See* Doc. #460 at 26-29). "Christian & Small, LLP was hired to defend Samara's law suit concerning the fraudulent transfer of the arbitration funds to DISC. Consequently, it was incumbent on this law firm as officers of the court to make sure that they did not further and assist their client's allegedly fraudulent behavior by allowing their client to pay them with a portion of the subject funds." (Doc. #460 at 26).

### 1.    Christian & Small's Potential Liability as a Subsequent Transferee[39]

As grounds for this claim, the Trustee asserts that it was "incumbent on this law firm as officers of the court to make sure that they did not further and assist their client's allegedly fraudulent behavior by allowing their client to pay them with a portion of the subject funds . . . the law firm cannot qualify as a good faith transferee taking for value and is liable under Ala. Code 1975

---

[38]In their brief in opposition to summary judgment, the Firm notes that although the complaint specifically seeks judgment against the Firm only as to Counts Twenty and Twenty-One, "earlier counts seek judgment against the 'other defendants.'" (Doc. #458 at 3). "The sheer number of those counts and the nature thereof make uncertain which actual counts refer to and seek judgment against the Firm." (*Id.*) By all appearances the Trustee has limited the number of claims brought against the Firm, arguing "fraudulent transfer claims against Christian & Small as a subsequent transferee" and that "a ruling of compensatory civil contempt is also appropriate." (Doc. #470 at 2; Doc. #461 at 28).

[39]This claim is apparently covered by Count Twenty-One of the Sixth Amended Complaint which suggests that the formation of NAD was a sham or ruse which had only the purpose of thwarting Samara's efforts to collect on the judgment. (*See* Doc. #443).

section 8-9A-b(b)."  (Doc. #461 at 26, 28).  The Firm received payments over the course of its representation of the Davis Defendants from several sources: in 2002, the Firm received the first payment from DISC continuing through March 2004 for a total of $184,867.40; in May 2004, Davis provided two payments to the Firm for a total of $24,608.40; and from May 2004 through February 2005, NAD made payments to the Firm for a total of $118,074.79.  The Firm does not dispute that these payments were made; rather, it maintains that it took in good faith and for reasonably equivalent value.  (*See* Doc. #458 at 15; *see also* Richard Smith Dep. at 53).

Indeed, the Firm cannot be liable as a subsequent transferee if it took for value and in good faith.  § 8-9A-8(b)(2).  There can be no real dispute (and in fact the Trustee does not argue) that the Firm received the payments for value.  (*See* Doc. #461 at 26-28).  All of the transfers made to the Firm were for legitimately earned legal fees and expenses due to the Firm's defense of its clients, Davis, International, DISC, and NAD.  (Smith Aff. at 8-9).  The fees were charged at a rate comparable to hourly rates charged in the Birmingham legal community for equivalent services and similarly situated attorneys. (Smith Aff. at 9).  Therefore, the only real question is whether Christian & Small took in good faith.

The Trustee asserts that "Christian & Small had sufficient knowledge of the situation that they did not act in good faith because they either knew they received payments that came from the disputed arbitration funds, or they failed to inquire with their client as to the source of the payments." (Doc. #460 at 27-28).  The Firm responds that its behavior cannot be construed as being in less than in good faith.  Until March 2004, payments were made by DISC; DISC was found *not* to be the

recipient of a fraudulent transfer in March 2003.[40]  (*See* Doc. #93).  At the time the Firm received

a payment from Davis himself, Davis had been (apparently) dismissed from the underlying lawsuit

by Judgment as a Matter of Law, and a later constructive trust purportedly imposed against Davis

was called into question by the Eleventh Circuit.  (*See* Docs. #145, 213, 242, 314).  Although later

the Firm received payments from NAD, the firm had repeatedly counseled Davis to ensure that NAD

did not obtain any of the disputed settlement proceeds.  (Dudley Aff. at 3) ("I had no control over

the defendants with respect to any money or assets they had or held, except to the extent to which

they might heed my advice.  I did discuss with Mr. Davis the nature of the initial funding of NAD.

I cautioned him on several occasions that if he wanted to keep NAD separate from his other

corporations, he should not use any funds which might be considered part of the 'settlement

proceeds' from the Yemen settlement to fund NAD; and he assured me that would not be the case.").

Davis assured the Firm that he would heed that advice.  (*See* Dudley Aff. at 3-4).  And, when the

rubber hit the road, and presumably the Firm smelled something rotten in the state of Denmark (or,

more precisely here, something rotten in the wheeling and dealing, no holds barred financial world

of the Davis Defendants), the Firm was allowed to withdraw from representation on September 26,

2007.  (*See* Doc. #365).

   These facts simply do not evidence a law firm acting in less than good faith.  During the

period of time that the Firm continued representation of the Davis Defendants and accepted

payments therefrom, nothing would have suggested to or alerted the Firm that the payments received

might later be claimed as fraudulent transfers.  Therefore, the Firm's motion for summary judgment

---

[40]The fraudulent transfer claim did not appear on the scene until well into the Firm's
representation of the Davis Defendants.  (*See* Doc. #472 at 11).

(Doc. #457) as to this claim is due to be granted, and that of the Trustee (Doc. #460) is due to be denied.

### 2. Civil Contempt for Money Paid in Violation of Court Order[41]

Count Twenty of the Sixth Amended Complaint asserts a claim for "money paid in violation of court rules." This claim asserts that Christian & Small received payment of some of its attorneys fees and expenses in violation of orders imposing a constructive trust on International, DISC, and Davis. (*See* Doc. #414 at ¶¶ 134, 138).

On June 22, 2004, Judge Propst entered an order regarding constructive trust pending report and recommendation of magistrate judge. (*See* Doc. #174). The order imposed a constructive trust on monies or assets in possession of International and DISC[42] in the amount of the interlocutory judgment of $1,075,851.37 in favor of Samara.[43] (*See* Doc. #174 at 1). The order further instructed all defendants "from disposing or transferring any such money or assets without the express permission of this Court" and ordered Roy Davis to file a sworn statement on behalf of each

---

[41]Although Count Twenty of the Sixth Amended Complaint is, standing by itself, unclear, the court notes that in its brief in support of summary judgment the Trustee frames the claim as one for misrepresentations only to support its civil contempt claim, and not as one for fraud. (*See* Doc. #461 at 28-29). Therefore, no individual claim for fraud is considered herein.

[42]In November 2002, the lawsuit was amended to name DISC as an additional defendant. (Allenstein Aff. at 4).

[43]The order further notes that "Roy Davis stated at a preliminary hearing on this matter that the settlement money received from Yemen was held by S & Davis International Disc., Inc. The Court has been informed that Counsel for Defendant stated at a recent hearing before Judge Putnam that the settlement money was being held by Strickland & Davis International Disc., Inc. Therefore, the court imposes a constructive trust on said money or assets in the amount of the interlocutory judgment." (Doc. #174 at 1).

corporate defendant affirming that sufficient assets were on hand to satisfy the judgment in the case. (Doc. #174 at 1).

On July 1, 2004, Magistrate Judge Putnam entered a Report and Recommendation on a motion for accounting against Davis as owner of S&Davis International, which motion sought "to impose a constructive trust on any portions of the settlement which is held by any of the Defendants or which has been illegally transferred to third parties or companies in order to defraud Plaintiff." DISC was specifically named, and Judge Putnam noted that Alabama law recognizes that a constructive trust can be imposed on the grantee of a fraudulent conveyance even though the grantee is not a party to the litigation between the grantor and his creditor seeking the property conveyed. (Doc. #187 at 4-5). "As such," Judge Putnam wrote, "even the voluntary conveyance of the settlement proceeds from S&Davis to DISC Corporation subjects DISC Corporation to a constructive trust for the benefit of S&Davis's creditors, including [Samara]." (Doc. #187 at 7). Although recognizing that Davis and DISC had been dismissed from the case by non-final judgment, it was the recommendation of the magistrate judge that Samara's motion for imposition of a constructive trust over settlement proceeds in the hands of Davis, International, and DISC be granted. (*See* Doc. #187 at 9). It is based upon these orders that the Trustee bases its claim for civil contempt against the Firm. (*See* Doc. #461 at 28). But on October 19, 2006, the Eleventh Circuit vacated the constructive trust orders as to Davis and DISC, holding that those orders did not satisfy due process requirements and were unclear both on rationale and controlling Alabama law. (*See* Doc. #314).

The claim for civil contempt against the Firm cannot stand as is the case when proof is not clear and convincing. *See Jordan v. Wilson*, 851 F.2d 1290, 1292, 1294 (11th Cir. 1988). Clear and convincing proof must demonstrate that (1) the allegedly violated order was valid and lawful; (2) the

order was clear, definite, and unambiguous; and (3) the alleged violator had the ability to comply

with the order. *See id.* (citing *United States v. Koblitz*, 803 F.2d 1523, 1527 (11th Cir. 1986)); *see*

*also McGregor v. Chierico*, 206 F.3d 1378, 1383 (11th Cir. 2000). Here, at least two of those factors

are clearly absent. The Trustee admits that the Firm received *no* funds from Davis, International, or

DISC after May 2004, the date the constructive trust order was entered. (*See* Doc. #460 at 27).

Because of the timeline of events, Christian & Small *could not* have complied with the constructive

trust orders, which were entered *after* the Firm had received payments from the bound parties. The

payments that the Firm received from May 2004 through February 2005, totaling $118,074.79, were

received from NAD. (*See* Doc. #460 at 27). NAD was not a party to the 2002 lawsuit, nor was NAD

contemplated by Judge Propst or Judge Putnam when they imposed a constructive trust on the 2002

lawsuit defendants. (*See generally* Docs. #174, 187). Christian & Small had assurances from Davis

that no settlement proceeds would be used to fund NAD. And although there is evidence that NAD

was a subsequent fraudulent transferee of monies from the Yemen settlement, there is absolutely

nothing in the record to refute the Firm's continued representations that it instructed Davis not to use

money from the Yemen wheat settlement to fund NAD, or that the Firm knew that Davis was not

heeding its advice. (*See* Doc. #458, Exh. 3 at 3; Exh. 5 at 173; Exh. 7 at 56-57).

Moreover, the Eleventh Circuit held that the constructive trust orders lacked sufficient clarity.

(Doc. #314 at 4, 5). Our appellate court was "concerned that the district court never explained its

rationale for setting aside the previous judgments against appellants" and noted that "the Alabama

law with respect to precisely what conduct will warrant the imposition of a constructive trust is not

clear to this panel in light of the current briefing." (Doc. #314 at 4, 5). Indeed, it was unclear to all

of the parties concerned the effect of the orders entered prior to the Eleventh Circuit decision – on

summary judgment and on motion at the conclusion of the trial, DISC and Davis were dismissed as parties in the case; however, by the summer of 2004, Judges Propst and Putnam were imposing constructive trusts on parties that had been theretofore dismissed from the action. (*See* Docs. #174, 187). Therefore, the orders were anything but clear, definite, and unambiguous, and those orders cannot be used to hold the Firm liable for civil contempt.

On this record, there is nothing to suggest that the Firm should be liable for civil contempt. Christian & Small, LLP's motion for summary judgment (Doc. #457) as to this claim is due to be granted and that of the Trustee (Doc. #460) is due to be denied.

## VI.   Conclusion

For the reasons set forth herein, Defendant Christian & Small's motion for summary judgment (Doc. #457) is due to be granted, the Davis Defendants' motion for summary judgment (Doc. #459) is due to be denied, and the Trustee's motion for summary judgment (Doc. #460) is due to be granted in part and denied in part. A separate order will be entered.

**DONE** and **ORDERED** this _____17th_____ day of November, 2010.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE